[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11825

_____

D.C. Docket No. 8:11-cv-01329-EAK-TBM

DEAN KILGORE,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
 ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 16, 2015)

Before ED CARNES, Chief Judge, HULL and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Petitioner Dean Kilgore was serving a life sentence for first-degree murder,

a consecutive life sentence for kidnapping, and an additional consecutive five-year

sentence for armed trespass when he was convicted of capital murder and

sentenced to death for killing a fellow inmate, Emerson Robert Jackson.  Kilgore now appeals from the district court's denial of habeas relief, arguing that he is intellectually disabled, and, therefore, ineligible for the death penalty under the Eighth Amendment and Atkins v. Virginia, 536 U.S. 304 (2002).[1]  After thorough review, we affirm.

## I.

## A.

These are the essential facts.  Petitioner Dean Kilgore has been incarcerated most of his adult life.  Kilgore v. State, 55 So. 3d 487, 493 (Fla. 2010).  His entry into the Florida prison system began in 1970 when he was found guilty of, among other charges, three counts of aggravated assault with intent to kill.  Id.  He was released from custody on September 30, 1977.  Id.  On July 31, 1978, Kilgore broke into a woman's home late at night while she, her boyfriend, and their children were there.  Armed with a firearm, Kilgore shot the boyfriend to death in the presence of one of the children.  Kilgore then kidnapped the woman and took her to an orange grove where he kept her for the rest of the night.  After standing trial for these crimes in Florida's Circuit Court in Polk County, Kilgore was convicted in December 1978 of first-degree murder, kidnapping, and armed

---

[1] We use the terms "intellectually disabled" and "intellectual disability" in this opinion because, as the Supreme Court stated in Hall v. Florida, both law and medicine have moved away from the terms "mentally retarded" and "mental retardation."  134 S. Ct. 1986, 1990 (2014).

trespass. He was sentenced to a life term of imprisonment on the first-degree murder count, a life term of imprisonment on the kidnapping count, and five years' imprisonment on the armed trespass count, each sentence to run consecutively to the others.

Kilgore had served approximately eleven years of this sentence at the Polk Correctional Institution when he killed Emerson Robert Jackson. Kilgore and Jackson were lovers who had fought about Jackson's relationship with other inmates and the way Jackson would play his partners against each other. On February 13, 1989, Kilgore waited outside Jackson's cell and smoked a cigarette with another inmate until Jackson came out. At that point, Kilgore and Jackson got into a verbal argument, they struggled, and Kilgore pulled out of his pocket a homemade shank knife that he had borrowed from another inmate. Kilgore stabbed Jackson three times: one small stab above the rib cage; a larger stab in the back that hit his shoulder blade; and the fatal wound, a stab to the front that penetrated his chest cavity, went through his left lung, and punctured his aorta.

After the stabbing, Kilgore reached into the shower from the hallway and grabbed a can he had stashed there earlier. From this can, Kilgore poured a strong-smelling, caustic substance onto Jackson's face and neck, and tried unsuccessfully to light some matches. Jackson died as a result of the stab wounds. Kilgore went

3

to the administration building immediately after the incident and told the guards, "I stabbed the bitch and I hope he's dead."

Following Jackson's death, Kilgore was indicted for first-degree murder and possession of contraband by an inmate. Kilgore, 55 So. 3d at 493. After a jury trial, Kilgore was found guilty on both counts and, by a vote of nine to three, the jury recommended that he be sentenced to death. Id. at 494. At sentencing, the trial court found that two aggravating circumstances were proven beyond a reasonable doubt: (1) Kilgore was under sentence of imprisonment at the time he committed the murder, Fla. Stat. § 921.141(5)(a); and (2) Kilgore had been previously convicted of a felony involving the use or threat of violence to the person (first-degree murder, kidnapping, trespass with a firearm, three counts of assault with intent to commit murder in the second degree, two counts of aggravated assault, and resisting arrest with force), Fla. Stat. § 921.141(5)(b). Kilgore v. State, 688 So. 2d 895, 897 (Fla. 1996) (per curiam). The trial court also found two statutory mitigating factors: (1) Kilgore acted under the influence of extreme mental or emotional disturbance, Fla. Stat. § 921.141(6)(b); and (2) Kilgore's capacity to conform his conduct to the requirements of law was substantially impaired, Fla. Stat. § 921.141(6)(f). Kilgore, 688 So. 2d at 897. The trial court considered as nonstatutory mitigating factors Kilgore's extreme poverty as a child, his lack of education, and his poor mental and physical condition. Id.

After weighing all of the factors, the trial court determined that the death sentence was the appropriate sanction since the aggravating circumstances "far outweighed" the statutory and non-statutory mitigating circumstances. It reasoned that "the accomplishment of this murder necessitated considerable preparation, cunning, and stealth" because "[t]he day before the killing [Kilgore] borrowed the murder weapon from another inmate and prevailed upon a third inmate to refrain from emptying a garbage can which contained the solvent he intended to pour over the victim's body." After the murder, noted the trial court, Kilgore "calmly walked to the administration building where he told the guards, 'I stabbed the bitch.'" The trial court concluded that "[t]o sentence Mr. Kilgore to anything but death would be tantamount to giving him a license to kill."

The Florida Supreme Court affirmed Kilgore's conviction and death sentence on direct appeal, Kilgore, 688 So. 2d at 901, and the United States Supreme Court denied certiorari review, Kilgore v. Florida, 522 U.S. 832 (1997).

## B.

Kilgore then moved collaterally for post-conviction relief under Florida Rule of Civil Procedure 3.850 in the Circuit Court of Polk County, Florida. The court conducted a five-day evidentiary hearing on June 13-17, 2005. Kilgore later amended his post-conviction application claiming that he was intellectually disabled and, therefore, he could not be executed. The court appointed Dr. Hyman

5

Eisenstein, a neuropsychiatrist who had previously testified during Kilgore's 2005 evidentiary hearing as an expert for the defense, and neuropsychologist Dr. Michael Gamache as an expert for the State.  A second evidentiary hearing was conducted on January 22-23, 2007, on the intellectual disability issue.

The defense presented the testimony of Dr. Eisenstein and Dr. Henry Dee, a neuropsychologist, along with the testimony of Capital Collateral Regional Counsel investigator Katrina McNish.  As Dr. Eisenstein explained, the elements of an intellectual disability claim under Florida law are: (1) significantly subaverage general intellectual functioning, (2) existing concurrently with deficits in adaptive behavior, and (3) manifested during the period from conception to age eighteen.[2]  As for the first prong of the intellectual disability test, the Wechsler Adult Intelligence Scale ("WAIS") had been administered to Kilgore on six separate occasions, yielding full-scale IQ scores of 76 (Dr. William Kremper -- August 1989); 84 (Dr. P.V. Ciotola -- March 1990); 67 (Dr. Dee -- March 1994); 75 (Dr. Eisenstein -- August 2000); 74 (Dr. Dee -- October 2004); and 85 (Dr. Gamache -- May 2006).  Dr. Eisenstein opined that the full-scale IQ scores of 74, 75, and 76 were likely most representative of Kilgore's actual IQ.  Based on these

---

[2] Since 2001, Florida's statute has defined "mental retardation" as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18."  See Fla. Stat. § 921.137(1).  The statute further defines "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test," id., which the Florida Supreme Court interpreted as requiring a petitioner to establish he has an IQ of 70 or below.  See Jones v. State, 966 So. 2d 319, 329 (Fla. 2007).

scores, Eisenstein also offered that Kilgore met the first prong of Florida's intellectual disability test because Kilgore's IQ scores of 74 to 76 fell within the intellectual disability range.

As for the second prong of Florida's test -- impaired "adaptive functioning" -- Dr. Eisenstein concluded that Kilgore met the criterion because, according to family members and acquaintances, as a child Kilgore interacted with younger children and was described as "stupid" and "slow"; his communication skills were deficient and he was unable to properly file prison grievances, even if instructions were given; he was "slow" academically, according to inmate Charlie Thompson; and he "required" others to provide for him. Eisenstein reported that Kilgore had worked picking cotton, picking oranges by hand, and dishwashing -- none of which required a high level of skill. He also averred that Kilgore's 2004 Department of Corrections ("DOC") records indicated that Kilgore was not "motivated" to practice walking with a prosthetic leg he had received and did not wear it. Eisenstein also opined that if Kilgore were not incarcerated, he would be unable to care for himself and, indeed, probably would not be alive. The neuropsychiatrist offered that it would not be useful to examine Kilgore's current level of adaptive functioning because Kilgore was on death row where his environment was highly structured.

As for the last prong of the test -- Kilgore's intellectual functioning before age eighteen -- Eisenstein explained that there were no intelligence test results, or other testing results available to establish Kilgore's intellectual functioning or deficits in adaptive behavior prior to age eighteen. Investigator McNish confirmed that there were no substantive school records for Kilgore during his childhood. Since there were no records, Dr. Eisenstein performed a "retrospective study" that included speaking to Kilgore's family and others who knew him, and said that this kind of study was an acceptable methodology. He admitted, however, that it "is somewhat anecdotal and it's not what we consider to be scientific." Eisenstein gathered information from Kilgore's family and a classmate who all opined that Kilgore was "stupid," "mildly retarded," "off," and "slow." Eisenstein also reported that: Kilgore ate food from garbage cans; began drinking homemade "hootch" at age 3 and was regularly drinking alcohol by age 8; did not have control over his urine and feces; could not dress without assistance; was a loner; and was not able to care for himself. Dr. Eisenstein added that Department of Corrections records, dated after Kilgore had turned eighteen, indicated that he could not read or write. Dr. Eisenstein concluded that Kilgore met Florida's criteria for intellectual disability.

Dr. Dee, Kilgore's neuropsychology expert, agreed with Eisenstein's conclusion, although Dee advised the court that he had undertaken no additional

8

interviews or testing of Kilgore since 2005. He said that he had reviewed the other expert reports and had also spoken for an hour by telephone with Dr. Eisenstein. Dr. Dee recalled that in 1994 his diagnostic impression was that Kilgore presented with intellectual disability and mild dementia. He explained that this 1994 diagnosis was based largely on Kilgore's physical condition and his self-report because he had no other records to speak of. Dee believed that Kilgore's apparent mental deficiency was possibly the result of a head injury, or of microangiopathy encephalic vascular disease due to Kilgore's advanced diabetes, which had also resulted in the amputation of one of his lower legs. Dr. Dee admitted that previously he did not have enough information about adaptive functioning to opine about whether Kilgore met Florida's definition of intellectual disability. But, after reviewing Dr. Eisenstein's report and speaking with Eisenstein, he now could offer an opinion: "Well, there is nothing that he found or I found that is inconsistent with [intellectual disability]. It appears to fit the three-prong criteria that we use, low IQ seen before age 18 or actually age 15, I think was the original determination, and deficits in adaptive functioning in two or more areas."

The State countered with the opinion of Dr. Gamache, who opined that Kilgore did not meet Florida's definition for intellectual disability. As for the first prong, Dr. Gamache administered the WAIS-III test to Kilgore, who obtained a full-scale IQ score of 85. Dr. Gamache determined that these results accurately

9

mirrored Kilgore's functional abilities, and that Kilgore had been "straightforward [and] honest" and "put forward full effort" during the testing. Dr. Gamache administered ten of the eleven standard WAIS subtests to Kilgore, but was unable to administer the last one because Kilgore's wheelchair and shackles prevented him from using the table as necessary for the test.[3] Dr. Gamache did not believe that the omission of that subtest affected Kilgore's overall IQ score. Gamache concluded that Kilgore's intellectual functioning was not two or more standard deviations below average, as required by Florida law. Because Gamache saw no evidence in the WAIS testing that Kilgore could meet the intellectual functioning prong of the Florida statute, he did not reach any conclusions about the other two prongs of the test, though he did offer observations suggesting that Kilgore would not meet those criteria either.

As for Kilgore's intellectual functioning before age eighteen, Dr. Gamache reported that Kilgore grew up in an impoverished background, without the kind of academic and intellectual stimulation that would be ideal in facilitating school achievement and in maximizing one's intelligence. Kilgore told Dr. Gamache that he had come from a large family, his parents had remained together until he was about five, and he also lived with an aunt. Kilgore also admitted to Gamache that he had begun to get into trouble around the age of twelve, and was sent to the

---

[3] Of these eleven tests, Dr. Gamache administered six "verbal subtests" and four "performance subtests." The one test that he was unable to administer was the "picture arrangement test."

Oakley Training School in Mississippi, where he remained until age fifteen. Kilgore was credited with completing the fifth grade while at the training school.

As for Kilgore's adaptive functioning, Gamache noted that Kilgore got out of the reform school around 1965 and went to prison as an adult in 1970. Between 1965 and 1970, Kilgore lived with his mother and step-father in Lakeland, Florida, for part of that time, and he also lived with a female acquaintance and then on his own for part of the time. As a teenager, Kilgore worked for a woman who was a palm reader -- Kilgore took care of her home and office, tended the grounds, and passed out promotional cards around town. Although Kilgore operated a vehicle, he never tried to get a driver's license.

When Dr. Gamache asked Kilgore about his adult employment, Kilgore explained that he'd been locked up for most of his adult life; therefore, his adult vocational activities were in an institutional setting. Kilgore said he worked at the license tag factory, twice for extended periods of time, and he'd also done custodial work and kitchen work at the prison. Kilgore also said that he had taught himself to read and write by repeatedly going through comic books and magazines available at the Department of Corrections. Dr. Gamache thought this was significant since it showed that Kilgore was motivated and "creative" and made "use of the resources that he had available to him to try and improve his abilities."

11

Dr. Gamache noted that when he met with Kilgore, Kilgore did not have any difficulty understanding or answering questions or providing background information. Dr. Gamache added that in March 1990, Kilgore underwent a neurological examination while in the Department of Corrections and the results of the exam were normal -- there was no evidence of "any impairment of brain function or any neurological condition." When asked about any head injury, Kilgore advised that he was in a fight around 1967, and was thrown on his head. Kilgore considered it insignificant; there was no evidence of seizures, loss of consciousness, or cognitive impairment. Kilgore was not aware of ever being considered to be intellectually disabled; and Kilgore told Dr. Gamache, in no uncertain terms, that he was not intellectually disabled. Dr. Gamache agreed: "It's my opinion within a reasonable degree of psychological certainty that Mr. Kilgore is not [intellectually disabled]."

## C.

The state trial judge ultimately issued a 110-page final order on December 3, 2008, denying Kilgore's post-conviction motion in its entirety. In discussing the intellectual disability claim, the court first noted that "under Florida law, one of the criteria to determine if a person is [intellectually disabled] is that he or she has an IQ of 70 or below." The court observed that of the six IQ tests that Kilgore had taken, "the only full scale IQ score which meets Florida's [intellectual disability]

12

criteria is the score of 67 obtained during Dr. Dee's 1994" test.  The court found, however, that "that single score does not sufficiently satisfy the intellectual functioning prong for [intellectual disability]."  As the court explained, the score of 67 was "significantly lower than any of the other five IQ scores"; three of the other IQ scores were "very, very similar, 74, 75, 76"; the 1994 test was "prorated," which means that the score was estimated based on Kilgore's performance on only seven subtests (four verbal and three performance) of the eleven total subtests; even Dr. Dee admitted that proration could lead to inferior results; and the purpose of Dr. Dee's 1994 evaluation was not to assess Kilgore's intellectual disability but rather to conduct a neuropsychological exam.

The state trial court concluded that without the IQ score of 67, whether measured by a preponderance of the evidence or under a clear and convincing evidence standard, the petitioner did not meet Florida's requirements for finding significantly subaverage general intellectual functioning.  The court also said that because Kilgore did not show subaverage general intellectual functioning, it would not consider the other two prongs of Florida's intellectual disability test.  See Fla. Stat. § 921.137(1) (2007); Fla. R. Crim. P. 3.203(b).

Kilgore appealed to the Florida Supreme Court, which denied all relief on November 18, 2010.  The Florida Supreme Court began its analysis of Kilgore's intellectual disability claim by recognizing that the United States Supreme Court

had held that execution of the intellectually disabled constitutes "excessive" punishment under the Eighth Amendment to the United States Constitution, citing Atkins v. Virginia, 536 U.S. 304 (2002). See Kilgore, 55 So. 3d at 508-09. Relying on its prior precedent, the Florida Supreme Court then observed that requiring an IQ score of 70 or below to establish the first prong of intellectual disability did not violate the command of Atkins. See id. Turning to the facts of Kilgore's case, the Florida Supreme Court found that "the three IQ scores of 74, 75, and 76 appear to be the scores most representative as to whether Kilgore possesses 'subaverage general intellectual functioning.'" Id. at 509. Referencing the "[c]ompetent, substantial evidence" surrounding his scores, the Florida Supreme Court sustained the state trial court's finding that Kilgore did not meet the 70-IQ cutoff and, thus, held that he could not establish intellectual disability under Florida law. Id.

**D.**

After the Florida Supreme Court denied Kilgore's motion for rehearing and issued its mandate, Kilgore commenced this federal habeas petition, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of

Florida. Some time later, the federal district court denied Kilgore's petition in its entirety.[4]

In rejecting Kilgore's intellectual disability claim, the district court concluded that the Florida Supreme Court's decision -- imposing a cut-off IQ score of 70 -- was neither contrary to, nor an unreasonable application of controlling Supreme Court law. Among other things, the court found no merit to Kilgore's charge that Atkins required the states to impose an IQ cutoff of 75. Citing Atkins, the district court explained that the Supreme Court expressly had left to the states the determination of who should be classified as intellectually disabled. Because of this explicit delegation in Atkins, the district court determined that the Florida Supreme Court's decision did not run afoul of Supreme Court law.

After the district court denied Kilgore's petition, the United States Supreme Court ruled differently in Hall v. Florida, 572 U.S. ——, 134 S. Ct. 1986 (2014). Hall held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error [±5], the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001. Hall explained that a state's assessment of a defendant's intellectual disability should focus on whether he has evidenced, beginning "during the developmental period," both (1) "significantly subaverage

---

[4] Kilgore argued that his counsel was ineffective at the guilt, penalty and postconviction phases, and that he was intellectually disabled.

intellectual functioning," and (2) "deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances)." Id. at 1994. The Court emphasized that these criteria are "interrelated" and that no "single factor [is] dispositive." Id. at 2001. Thus, "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Id. at 2000 (quotation and citation omitted).

In light of this intervening decision, we granted Kilgore a certificate of appealability to address whether "the Florida Supreme Court's refusal to grant Kilgore relief on the basis of [intellectual disability] violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, applied to the States through the Fourteenth Amendment." This timely appeal followed.

## II.

### A.

We review de novo the district court's denial of a 28 U.S.C. § 2254 petition. Ward v. Hall, 592 F.3d 1144, 1155 (11th Cir. 2010). Because Kilgore filed his federal habeas petition after 24 April 1996, this case is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Id. Under AEDPA, if a state court has adjudicated the merits of a claim -- as the state court did here -- we cannot grant habeas relief unless the state court's decision "was

16

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).[5] "Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (alteration in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (alteration in original) (quoting Williams, 529 U.S. at 413).

---

[5] At oral argument, Kilgore's counsel mentioned in passing the Supreme Court's recent decision in Brumfield v. Cain, 135 S. Ct. 2269 (2015). There, a Louisiana death-row inmate had requested an opportunity to prove he was intellectually disabled in state court. Without affording him an evidentiary hearing or granting him time or funding to secure expert evidence, the state court rejected his claim. Id. at 2273. The Supreme Court held that Brumfield was entitled to have his Atkins claim considered on the merits in federal court because the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as provided for in 28 U.S.C. § 2254(d)(2). Id. Here, however, the "unreasonable determination of the facts" clause is not at issue because Kilgore has not challenged any factual determinations made by the state courts, nor has he made a § 2254(d)(2) argument. Moreover, in this case the petitioner was afforded an extensive hearing in the state court about his claimed intellectual disability.

17

To prevail under § 2254(d), a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). Kilgore must show that the state court's decision was "objectively unreasonable, not merely wrong; even clear error will not suffice." White v. Woodall, 572 U.S. ——, 134 S. Ct. 1697, 1702 (2014) (quotations omitted). Put differently, Kilgore must establish that no fairminded jurist would have reached the Florida court's conclusion. See Richter, 562 U.S. at 101. "If this standard is difficult to meet, that is because it was meant to be." Id. at 102.

**B.**

We address today one issue -- Kilgore's argument that the Florida Supreme Court unreasonably applied clearly established Supreme Court law when it upheld the imposition of the death penalty despite his claim of intellectual disability. First, he argues that the Florida Supreme Court's decision violated clearly established Supreme Court law embodied in Hall v. Florida, 134 S. Ct. at 2001. Kilgore says that because the Florida Supreme Court imposed a bright-line IQ cutoff of 70 in his case, it violated Hall. Second, the petitioner argues that if Hall was not clearly established Supreme Court law at the time the Florida Supreme Court denied him relief, then Hall should be applied retroactively. Finally, he

claims that even if Hall cannot be applied retroactively, its holding was a "refined explication" or an "interpretat[ion]" of Atkins, the clearly established Supreme Court law at the time of the Florida Supreme Court's decision. After careful review, we are unpersuaded. The Florida Supreme Court's determination was neither contrary to nor an unreasonable application of clearly established Supreme Court law.

We begin with this first principle: under § 2254(d)(1) of AEDPA, we must uphold a state court decision unless it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) (emphasis added); see also Williams, 529 U.S. at 412 (Section 2254(d)(1)'s "clearly established" phrase "refers to the holdings . . . of [the Supreme] Court's decisions as of the time of the relevant state-court decision."). It is abundantly clear that AEDPA "sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1398 (2001); see also Miller-El v. Cockrell, 537 U.S. 322, 326 (2003) ("In the interest of finality AEDPA constrains a federal court's power to disturb

state-court convictions."). The "clearly established Federal law" requirement is one of those limits.

The Florida Supreme Court affirmed Kilgore's convictions and sentences in 1996, and rejected Kilgore's intellectual disability claim in 2010. As of 2010, the United States Supreme Court had not yet decided Hall. Because the Florida Supreme Court's decisions in Kilgore's case predated Hall, Hall's holding was not "clearly established" for purposes of § 2254(d)(1) of AEDPA.

Kilgore claims that even if Hall was not "clearly established" in 2010, its holding merely "interpreted" or "refined" the "clearly established [Supreme Court] law" extant at the time of the Florida Supreme Court's decision. At that time, Atkins set forth the "clearly established [Supreme Court] law" concerning intellectual disability. See Hill v. Humphrey, 662 F.3d 1335, 1337 (11th Cir. 2011) (en banc) (applying "clearly established federal law, as announced in Atkins" to a 2003 state post-conviction decision); see also In re Holladay, 331 F.3d 1169, 1172 (11th Cir. 2003) (holding that Atkins applied retroactively on federal habeas review, no matter when the sentence was imposed). However, if Hall "interpreted" or "refined" Atkins, that does not mean its holding was "clearly established Federal law" under § 2254(d)(1). As we've said, "[t]he Supreme Court has repeatedly held that only the actual holdings of its decisions can 'clearly

20

establish[]' federal law for § 2254(d)(1) purposes." Loggins v. Thomas, 654 F.3d 1204, 1222 (11th Cir. 2011) (quotations omitted).

Hall's holding was not clearly established by Atkins. Atkins held that the execution of intellectually disabled offenders is categorically prohibited by the Eighth Amendment. Notably, Atkins did not define intellectual disability, nor did it direct the states on how to define intellectual disability, nor, finally, did it provide the range of IQ scores that could be indicative of intellectual disability. Rather, Atkins expressly left it to the states to develop "appropriate ways to enforce the constitutional restriction" on executing the intellectually disabled. See Atkins, 536 U.S. at 317 (citation and quotation omitted). Or as the Supreme Court put it in Bobby v. Bies, "[Atkins] did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] 'will be so impaired as to fall [within Atkins's compass].'" 556 U.S. 825, 831 (2009); see also Hill, 662 F.3d at 1338 ("Atkins expressly left it for the states to develop the procedural and substantive guides for determining who is [intellectually disabled].").

Hall, however, changed course by requiring the states to recognize a margin of error of five points above or below an IQ score of 70 in assessing intellectual disability. As we've previously observed, "[f]or the first time in Hall, the Supreme Court imposed a new obligation on the states not dictated by Atkins because Hall

21

restricted the states' previously recognized power to set procedures governing the execution of the intellectually disabled." In re Henry, 757 F.3d 1151, 1158-59 (11th Cir. 2014). "Nothing in Atkins dictated or compelled the Supreme Court in Hall to limit the states' previously recognized power to set an IQ score of 70 as a hard cutoff." Id. at 1159.

Even Hall itself expressly acknowledged that its holding was taking the Supreme Court's prior precedents "further" and that the Court was using its "independent judgment" to declare the Florida statute unconstitutional. See Hall, 134 S. Ct. at 1999-2000 ("[T]he precedents of this Court 'give us essential instruction,' . . . but the inquiry must go further. . . . In this Court's independent judgment, the Florida statute, as interpreted by its courts, is unconstitutional."). Moreover, Justice Alito's dissenting opinion (joined by Chief Justice Roberts, Justice Scalia, and Justice Thomas) observed that the Hall majority "sharply depart[ed] from the framework prescribed in prior Eighth Amendment cases," id. at 2002 (Alito, J., dissenting); that Hall "mark[ed] a new and most unwise turn in our Eighth Amendment case law," id.; and that Hall relied on "the standards of professional associations," unlike "our modern Eighth Amendment cases," which relied on "our society's standards," id. at 2005.

Indeed, in Beard v. Banks, 542 U.S. 406, 416 (2004), the Supreme Court observed that it may rely on a dissenting opinion to determine whether the holding

in a case was dictated by existing precedent.  There, the Supreme Court analyzed whether the rule drawn from Lockett v. Ohio, 438 U.S. 586 (1978) -- that a sentencer "[can]not be precluded from considering" any mitigating evidence -- compelled the rule later announced in Mills v. Maryland, 486 U.S. 367 (1988) -- that states may not require jurors to find mitigating factors unanimously.  In rejecting the argument, the Supreme Court pointed out that, in Mills and later related cases, groups of dissenting Justices had argued that Lockett addressed a fundamentally different issue than was raised in Mills.  Recognizing that these dissents meant that "reasonable jurists could have differed as to whether the Lockett principle compelled Mills," Beard concluded that Lockett did not even support, let alone compel, the Mills rule.  See Beard, 542 U.S. at 415 (discussing Mills, 486 U.S. at 394 (Rehnquist, C.J., dissenting), and McKoy v. North Carolina, 494 U.S. 433, 464-66 (1990) (Scalia, J., dissenting)).  So too here -- the observations from Hall's four dissenting Justices further illustrate that its holding was not clearly established in the Court's existing precedent.

The long and short of it is that the Florida Supreme Court was tasked with applying Atkins to Kilgore's case.  Florida's high court properly recognized Atkins as the controlling law, and did not unreasonably apply it.  As the Supreme Court has made abundantly clear, whether a state court "unreasonably applies" clearly established Supreme Court law depends "not [on] whether a federal court believes

23

the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). A state court's application of federal law is not unreasonable so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Atkins expressly left it to the states to develop "appropriate ways to enforce the constitutional restriction" on executing the intellectually disabled. See Atkins, 536 U.S. at 317 (citation and quotation omitted). In rejecting Kilgore's claim, the Florida Supreme Court relied on its prior precedent, which repeatedly had held that the firm IQ-of-70 cutoff used in its intellectually disability test did not violate Atkins. See, e.g., Nixon v. State, 2 So. 3d 137, 142 (Fla. 2009); Cherry v. State, 959 So. 2d 702, 711-14 (Fla. 2007) (per curiam). Nothing in Atkins suggested that a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled. Thus, the Florida Supreme Court did not unreasonably apply Atkins's ban on the execution of the intellectually disabled by setting a bright-line IQ cutoff at 70.

## C.

Our inquiry does not end there because Kilgore argues that even if Hall was not clearly established Supreme Court law at the time the Florida Supreme Court ruled, Hall should be applied retroactively to his case. In Williams, Justice

24

O'Connor, writing for five Justices, observed that the standard found in § 2254(d)(1) -- requiring federal courts to ascertain whether a state court decision involves an "unreasonable application of . . . clearly established Federal law" -- is "related" to (though different from) the "inquiry" courts perform when applying the nonretroactivity rule found in Teague v. Lane, 489 U.S. 288 (1989). Williams, 529 U.S. at 409. Teague, a pre-AEDPA case, held that a petitioner was not entitled to federal habeas relief when he was relying on a "new rule" of federal law, unless certain exceptions are met. See Lambrix v. Singletary, 520 U.S. 518, 527 (1997) (citing Teague, 489 U.S. at 310). Justice O'Connor noted in Williams that "whatever would qualify as an old rule under our Teague jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1)" -- so long as the "old rule" under Teague is found in the Supreme Court's jurisprudence. Williams, 529 U.S. at 412; see also Loggins, 654 F.3d at 1221 ("The content of the § 2254(d) unreasonable application test is drawn in large part from the Teague . . . nonretroactivity doctrine and the decisions explicating it." (quotation omitted)).

Under Teague, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301. If that requirement has been met, there are two exceptions to Teague's bar on retroactivity: (1) new rules that place an entire category of primary conduct

25

beyond the reach of the criminal law, or that prohibit imposition of a certain type of punishment for a class of defendants because of their status or offense; and (2) new "watershed rules of criminal procedure" that are necessary to the fundamental fairness of the criminal proceeding. Id. at 311-13; Sawyer v. Smith, 497 U.S. 227, 241-42 (1990). Kilgore relies on the first Teague exception, but not the second. Neither applies here.[6]

In the application of Teague, we first ask whether Hall announced a new rule of law, or whether it was "dictated" by existing precedent at the time the Florida Supreme Court ruled. See Graham v. Collins, 506 U.S. 461, 467 (1993) ("A holding constitutes a 'new rule' within the meaning of Teague if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not 'dictated by precedent existing at the time the defendant's conviction became final.'") (quoting Teague, 489 U.S. at 301); Butler v. McKellar, 494 U.S. 407, 415 (1990) ("[T]he fact that a court says that its decision is within the 'logical

---

[6] Notably, neither this Court nor the Supreme Court has squarely answered "[w]hether § 2254(d)(1) would bar a federal habeas petitioner from relying on a decision that came after the last state-court adjudication on the merits, but fell within one of the exceptions recognized in Teague." See Greene v. Fisher, 132 S. Ct. 38, 44 n.* (2011) (citation omitted); Loggins, 654 F.3d at 1221 (declining to consider whether "the exceptions to the Teague non-retroactivity doctrine survived the AEDPA amendments and live on in the partial codification of the doctrine that is § 2254(d)(1)"). In Loggins, we said that "[w]e have sidestepped that question before, see Grossman v. McDonough, 466 F.3d 1325, 1341 n. 13 (11th Cir. 2006), and we are content to do so again because the answer will not affect the result in this case." Loggins, 654 F.3d at 1221; see also Greene, 132 S. Ct. at 44 n.* (concluding that Teague's application to § 2254(d)(1) "is a question we need not address to resolve this case"). Because Kilgore has not shown that Hall should be applied retroactively under Teague or its exceptions, again we need not answer whether Teague's exceptions survive § 2254(d)(1).

compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under <u>Teague</u>.").  As we have already observed, this question was squarely addressed in <u>In re Henry</u>, where we rejected the argument that <u>Hall</u>'s holding -- limiting the states' previously recognized power to set an IQ score of 70 as a hard cutoff -- was "clearly established" by <u>Atkins</u>, 536 U.S. at 317.  We said that <u>Atkins</u> had expressly "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences."  <u>In re Henry</u>, 757 F.3d at 1158 (alteration in original) (quoting <u>Atkins</u>, 536 U.S. at 317).  Therefore, we held that <u>Hall</u> necessarily established a new rule of constitutional law.  <u>Id.</u> at 1159.

Since <u>Hall</u>'s holding undeniably is "new," we turn to Kilgore's claim that it meets the first <u>Teague</u> exception -- that it prohibits the imposition of a certain type of punishment for a class of defendants because of their status or offense.  Applying this exception, the Supreme Court has said that a rule prohibiting "the execution of [intellectually disabled] persons . . . would be applicable to defendants on collateral review" because "a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all."  <u>Penry v. Lynaugh</u>, 492 U.S. 302, 330 (1989).  Thus, when <u>Atkins</u> later held that "an exclusion for the

[intellectually disabled] is appropriate," 536 U.S. at 319, we recognized that Atkins established a new rule of constitutional law. We concluded that "the new constitutional rule abstractly described in Penry and formally articulated in Atkins is retroactively applicable to cases on collateral review." In re Holladay, 331 F.3d at 1173.

But the same result does not hold true for Hall, which merely provides new procedures for ensuring that states follow the rule enunciated in Atkins. As we held in In re Henry, Hall did not expand the class of individuals protected by Atkins's prohibition. In re Henry, 757 F.3d at 1161. Rather, Hall created a procedural requirement that those with IQ test scores within the test's standard of error would have the opportunity to otherwise show intellectual disability. Hall guaranteed only a chance to present evidence, not ultimate relief. Therefore, as we recognized in In re Henry, Penry in no way dictated that the rule announced in Hall is retroactive to cases on collateral review. See id.

Nor did Hall, as the petitioner recognizes, announce a "watershed" rule under Teague's second exception. "To fall within this exception, a new rule must meet two requirements: Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction, and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." Tyler v. Cain, 533 U.S. 656, 665 (2001) (quotation and emphasis

28

omitted).  The presentation of evidence by a defendant seeking to establish

intellectual disability does not meet this standard.  See Beard, 542 U.S. at 417

(discussing the limited scope of the exception and noting that the Supreme Court in

"providing guidance as to what might fall within this exception," has "repeatedly

referred to the rule of Gideon v. Wainwright, 372 U.S. 335 (1963) (right to

counsel), and only this rule").  Hall does not meet any of the Teague exceptions to

nonretroactivity.

Kilgore attempts to distinguish In re Henry in order to avoid its

unambiguous holdings about nonretroactivity.  We remain unpersuaded.  There is

no denying that In re Henry arose in the context of a "second or successive"

application for habeas relief, 28 U.S.C. § 2244(b)(2)(A) (asking whether "the claim

relies on a new rule of constitutional law, made retroactive to cases on collateral

review by the Supreme Court, that was previously unavailable"), whereas here we

are called upon to decide Kilgore's first federal habeas petition, see 28 U.S.C. §

2254(d) (asking whether the state court's decision "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States").  But that distinction makes no difference.  In

both In re Henry and in this case, we look to Teague to determine whether Hall has

set forth a rule that should be applied retroactively.  Compare In re Henry, 757

F.3d at 1158 (citing Teague in the § 2244(b) inquiry), with Williams, 529 U.S. at

29

412 (citing Teague in the § 2254(d)(1) inquiry for a first habeas petition).  Indeed, in Williams, the Supreme Court acknowledged that "whatever would qualify as an old rule under our Teague jurisprudence" would qualify as the rule to be applied for purposes of § 2254(d)(1), so long as the rule had been announced by the Supreme Court.  529 U.S. at 412.  Because the question in both contexts -- whether Hall constitutes the Supreme Court law applicable under AEDPA to the state court decision being challenged -- is the same, the answer is the same as well.

Nor does it matter that Henry's IQ allegedly may have been 78, which, says Kilgore, put Henry outside the protection of Hall.  To begin with, In re Henry's ruling on retroactivity in no way hinged on Henry's IQ.  Rather, we addressed the retroactivity issue first, and, only after having decided the statutory question of retroactivity did we hold that Henry had not met the other prudential requirement we established in the case law -- that "there is a reasonable likelihood" he is entitled to relief under the new rule, In re Holladay, 331 F.3d 1169, 1173 (11th Cir. 2003).  See In re Henry, 757 F.3d at 1161 (Henry's "problem is compounded, . . . because even if the Supreme Court had made the rule announced in Hall retroactive to cases on collateral review -- and it has not done so -- we still could not authorize the filing of a second or successive habeas petition because Henry has not made a 'sufficient showing of possible merit to warrant a further exploration by the district court.'") (citation omitted).  We arranged the analysis in

30

that order because we were required to do so.  See id. at 1157 n.9 ("[B]efore deciding whether a petitioner has shown a reasonable likelihood of benefiting from a rule, we are obliged to address the statutory command and decide whether that rule was 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.'") (quoting 28 U.S.C. § 2244(b)(2)(A)).  In re Henry squarely addressed Hall's retroactivity, regardless of Henry's IQ score.

Moreover, even if we were to say that this was an alternative holding, alternative holdings are binding precedent.  Bravo v. United States, 532 F.3d 1154, 1162 (11th Cir. 2008) ("[I]n this circuit additional or alternative holdings are not dicta, but instead are as binding as solitary holdings."); see also Massachusetts v. United States, 333 U.S. 611, 623 (1948) (explaining that where a decision "rested as much upon the one determination as the other . . . the adjudication is effective for both").  This means that if our ruling on the merits of Henry's claim was on equal footing with our ruling on retroactivity, both rulings are of equal import, and both bind us today.  Plainly, nothing meaningfully distinguishes In re Henry from this case, nor otherwise convinces us that Hall can be applied retroactively.

**D.**

Finally, even if we were writing on a blank slate, unencumbered by the command of § 2254(d)(1) and our unambiguous holding in In re Henry, we would

31

still decline to apply <u>Hall</u> retroactively.  As the Supreme Court made abundantly clear in <u>Teague</u>, there are powerful reasons for a federal court sitting in habeas corpus to judge a state court's decision on the basis of the law as it existed at the time the state court rendered its decision.  The principle of nonretroactivity was derived in substantial measure from the purpose and function of federal habeas corpus -- that is, to encourage "trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards."  <u>Teague</u>, 489 U.S. at 306 (quoting <u>Desist v. United States</u>, 394 U.S. 244, 262-63 (1969) (Harlan, J., dissenting)).  According to the Supreme Court, "the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place" in order "to force the trial and appellate courts to toe the constitutional mark."  <u>Id.</u> at 306-07 (quotations, brackets, and alterations omitted).  <u>Teague</u> further explained that applying new rules on <u>collateral</u> review would "seriously undermine[] the principle of finality which is essential to the operation of our criminal justice system.  Without finality, the criminal law is deprived of much of its deterrent effect."  <u>Id.</u> at 309.  "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing that a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation."  <u>Id.</u> (quoting <u>Mackey v. United States</u>, 401 U.S. 667, 691 (1971) (Harlan, J.,

32

concurring in judgments in part and dissenting in part)).  Teague also explained

that "the application of new rules to cases on collateral review" would impose

great costs "by continually forc[ing] the States to marshal resources in order to

keep in prison defendants whose trials and appeals conformed to then-existing

constitutional standards."  Id. at 310.

Justice O'Connor, writing for a plurality in Teague, concluded that habeas

does not exist just to serve some "perceived need to assure that an individual

accused of a crime is afforded a trial free of constitutional error," id. at 308

(quoting Kuhlmann v. Wilson, 477 U.S. 436, 447 (1986)); instead, weighty

"interests of comity and finality" persuaded the Court that new rules governing

criminal prosecutions should not be applied retroactively on collateral review to

cases that are already final, id.  These considerations apply here.  In Hall, the

United States Supreme Court no longer took a hands-off approach to the states'

intellectual disability definitions.  To retroactively apply this kind of new

procedural rule to the final determination of a state court appeal would impose the

very uncertainty and costs on the states that Teague warned against -- discouraging

the states from rigorously developing and following their intellectual disability

law, decreasing the importance of finality and its effect on deterrence given the

ever-changing nature of our understanding of intellectual disability, and

unnecessarily pressing the states to re-evaluate defendants each time intellectual disability standards are changed.[7]

### III.

In short, Kilgore has failed to establish that the Florida Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established Supreme Court law, as it existed at the time the state court rendered its decision. He has also failed to convince us that we should apply retroactively the Supreme Court's recent decision in Hall. We, therefore, affirm the denial of Kilgore's petition for habeas relief.

**AFFIRMED.**

---

[7] Notably, none of the cases Kilgore cites -- all from other circuits -- has squarely held that Hall is retroactively applicable. The only circuit case we've located that has decided the issue is an unpublished decision by the Eighth Circuit, Goodwin v. Steele, No. 14-3739 (8th Cir. Dec. 9, 2014), which held that "Goodwin has not made a prima facie showing that the Supreme Court has held that Hall is retroactive." Slip Op. at 5.