[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15043

_____

D.C. Docket No. 2:13-cv-00557-RDP

WILLIE B. SMITH, III,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 22, 2019)

Before WILSON, MARTIN, and JORDAN, Circuit Judges.

WILSON, Circuit Judge:

Willie B. Smith III, a death row inmate, appeals the district court's denial of

his 28 U.S.C. § 2254 habeas corpus petition.  The district court granted Smith a

certificate of appealability (COA) on whether he is intellectually disabled and thus ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).  We granted Smith's request to expand the COA to include whether the prosecutor at Smith's state trial struck jurors on the basis of gender, race, and national origin in violation of the Sixth and Fourteenth Amendments under *Batson v. Kentucky*, 476 U.S. 79 (1986), and *J.E.B. v. Alabama*, 511 U.S. 127 (1994).  After careful review of the record and with the benefit of oral argument, we affirm the district court's denial of habeas relief.

## I.    Factual and Procedural Background

In 1992, an Alabama jury found Smith guilty of capital murder.  By a 10-2 vote, the jury recommended that Smith be sentenced to death, which the court imposed.

### A. *Jury Selection and* Batson *Hearing*

During jury selection in Smith's trial, the state prosecutor used 14 of his 15 peremptory strikes on women.  The prosecutor also struck several black venire members and the sole Hispanic venire member.  Smith's counsel objected, arguing that the prosecutor was discriminating on the basis of gender, race, and national origin.  The state trial court held that Smith failed to make a prima facie showing of discrimination, and the trial proceeded.  The ultimate jury was comprised of five women and seven men.

2

On direct appeal, the Alabama Court of Criminal Appeals (Alabama CCA) found that Smith had provided sufficient evidence for a prima facie showing of gender-based discrimination under *J.E.B. v. Alabama*, 511 U.S. 127 (1994). *See Smith v. State*, 698 So. 2d 1166, 1169 (Ala. Crim. App. 1997). The Alabama CCA remanded the case for a hearing so that the prosecutor could present his reasons for the strikes.

On remand, the prosecutor offered explanations for each strike; those explanations included employment, marital status, age, knowledge of criminal law, and work with various churches and religious groups. At the hearing, the prosecutor explained:

> I struck a lot of these [venire members] because they worked in the church; Sunday School teachers and Sunday School leaders, and things of that nature, and . . . I knew the defense counsel, if it came to the second phase of the sentencing hearing, would be asking the jurors to show mercy. And, it was my opinion that this argument would be receptive to someone who worked in the church and was well versed in the Bible more than someone who was not; be a female or male juror that was a strong worker in the church. No male jurors that was [sic] left seated on the jury worked in the church.

In response, Smith's counsel argued that the prosecution did not strike everyone who had religious affiliations[1] and questioned why the prosecution had not asked

---

[1] At the hearing, Smith's counsel did not identify any men with religious affiliations who were not struck by the prosecution. Smith's counsel identified one woman, Ms. Parham, who may

3

any follow-up questions about the venire members' religious beliefs.  Next, the prosecutor explained that he eliminated the sole Hispanic venire member because she was young and did not respond to questions during voir dire; Smith's counsel argued this explanation was insufficient.

The state trial court ultimately found that the prosecutor's reasons for striking the female venire members were gender neutral, that those reasons were credible, and that Smith had failed to prove that the prosecutor had acted in a discriminatory manner.  On appeal after remand, the Alabama CCA affirmed. *Smith v. State*, 838 So. 2d 413 (Ala. Crim. App. 2002) (hereinafter *Smith II*).  The Supreme Court denied Smith's petition for writ of certiorari.  *Smith v. Alabama*, 537 U.S. 1090 (2002).

### B. Smith's Post-Conviction Hearings

Smith then filed a petition for state post-conviction relief under Alabama Rule of Criminal Procedure 32.  The petition included a claim of intellectual disability, and the Rule 32 court conducted an evidentiary hearing on this claim.

At the hearing, Dr. Salekin, Smith's expert, testified that Smith scored a 64 on a full IQ test and exhibited adaptive deficits in several areas.  Dr. Salekin also

---

have worked in a church but was not struck by the prosecution.  In later briefing at the trial court, Smith identified John Hall, who served as a football coach for the Young Men's Christian Association (YMCA), but was not struck by the prosecution.  Finally, in his appellate briefing, Smith raised "Mr. Johnson," an unidentified male member of the venire who stated that he served on his church's board, but was not struck by the prosecution.

testified, however, that Smith scored relatively well on a separate test that assessed Smith's language, reading, and mathematics skills, and that these particular results were inconsistent with a diagnosis of intellectual disability.  Dr. Salekin's final opinion was that Smith was not intellectually disabled.  Dr. Salekin also testified that there was no national medical consensus on using the "Flynn Effect" to adjust IQ scores.[2]

The state called Dr. King, who testified that Smith scored a 72 on a full IQ test, including verbal score of 75 and nonverbal score of 74.[3]  Smith's score on the verbal portion of Dr. King's IQ test matched a previous score he achieved on the verbal portion of a partial IQ test administered by Dr. Blotcky, a court-appointed psychologist.[4]  Like Dr. Salekin, Dr. King's final opinion was that Smith was not intellectually disabled, and he agreed that there was no national medical consensus on using the Flynn Effect to adjust IQ scores.

The Rule 32 court denied Smith's Rule 32 petition, and the Alabama CCA affirmed.  *Smith v. State*, 112 So. 3d 1108 (Ala. Crim. App. 2012) (*Smith III*), *cert. denied*, *Ex parte Smith*, 112 So. 3d 1152 (Ala. 2012).

*C. Further Procedural History*

---

[2] The "Flynn Effect" is a theory that contends that IQ scores have been increasing over time and suggests that IQ scores should be recalibrated in order to reflect this increase.

[3] Dr. King also testified that, using a standard error of measurement, Smith's IQ could have been as low as 68 or as high as 77.

[4] Dr. Blotcky never administered a full IQ test, for reasons that remain unexplained.

5

Smith filed his original federal habeas petition in the Northern District of Alabama, which the district court denied.  One day after denying Smith's petition, the district court reopened the action for the sole purpose of considering the effect, if any, of *Moore v. Texas*, 137 S. Ct. 1039 (2017), on Smith's *Atkins* claim.  After supplemental briefing, the district court concluded that *Moore* did not apply retroactively and reaffirmed the denial of Smith's petition.  The district court granted Smith a COA on his *Atkins* claim, and we granted him a COA on his *Batson* claim.

## II.    Standard of Review

We review de novo the district court's denial of a 28 U.S.C. § 2254 petition. *Ward v. Hall,* 592 F.3d 1144, 1155 (11th Cir. 2010).  Because Smith filed his petition after April 24, 1996, this appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  AEDPA "establishes a highly deferential standard for reviewing state court judgments." *Parker v. Sec'y, Dep't. of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003).  Under AEDPA, a federal court may only grant a writ of habeas corpus if the state court's determination of a federal claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

6

The phrase "clearly established Federal law" encompasses only the holdings of the Supreme Court of the United States "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Section 2254(d) provides two separate bases for reviewing state court decisions—"the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

A state court's determination is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A state court's determination is "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. Reasonableness is objective, and a federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that the state court was incorrect. *Id*. at 410.

Finally, under § 2254(d)(2), we presume that the state court's findings of fact are correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). "This deference requires that a federal habeas court more than simply

disagree with the state court before rejecting its factual determinations.  Instead, it must conclude that the state court's findings lacked even fair support in the record."  *Rose v. McNeil*, 634 F.3d 1224, 1241 (11th Cir. 2011) (citations omitted).

### III.    *Atkins* **Claim**

Smith first argues that the district court erred in holding that the Supreme Court's recent holding in *Moore v. Texas* did not apply retroactively to his intellectual disability claim.  We agree with the district court that *Moore* is not retroactive.  Smith also argues that the Alabama state courts unreasonably applied *Atkins v. Virginia* in evaluating his intellectual disability claim.  After careful review of the state court record and its order, we hold that the state court's denial of his intellectual disability claim was not an unreasonable application of clearly established federal law.

### A. The Non-Retroactivity of Moore v. Texas

In *Atkins v. Virginia*, the predecessor to *Moore*, the Supreme Court held that the execution of individuals with intellectual disabilities violated the Eighth Amendment.  536 U.S. 304 (2002).  But the Court did not define what it means to be intellectually disabled, leaving that task to individual state legislatures and courts.  *Id*. at 317.  In the years following *Atkins*, states developed different criteria for assessing intellectual disability.  Some states delineated a bright line threshold for IQ scores, while others did not.

In *Hall v. Florida*, the Court clarified that a state court's intellectual disability determination should be "informed by the medical community's diagnostic framework."  572 U.S. 701, 721 (2014).  This meant, among other things, that courts must consider the standard error inherent in IQ tests when a defendant's test scores put him "within the clinically established range for intellectual-functioning deficits."  *Moore*, 137 S. Ct. at 1050; *see also Hall*, 572 U.S. at 723.  In those cases, defendants must be allowed to present additional evidence of intellectual disability, including testimony on adaptive deficits.  *Hall*, 572 U.S. at 723.

In *Moore*, the Court expanded on *Hall*, reiterating that state courts do not have "unfettered discretion" in their determination of whether a capital defendant is intellectually disabled.  137 S. Ct. at 1052.  Specifically, *Moore* established that states cannot disregard current clinical and medical standards in assessing whether a capital defendant is intellectually disabled.  In addition, the Court clarified that under prevailing clinical standards, the focus of the adaptive functioning inquiry should be an individual's adaptive deficits—not adaptive strengths.  *Id.* at 1050−51.  After *Moore*, states cannot "weigh" an individual's adaptive strengths against his adaptive deficits.

Because *Moore* was decided five years after the Alabama state courts decided Smith's *Atkins* claim, he concedes that *Moore* could not have been "clearly

9

established Federal law" at that time.  Smith instead argues that *Moore* announced a new rule of constitutional law that should be applied retroactively under *Teague v. Lane*, 489 U.S. 288 (1989).

New constitutional rules are generally not retroactive for cases on federal habeas review.  *See id.*  To determine whether a rule is retroactive, we first decide if it is a new rule.  Under *Teague*, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government," or when "the result was not *dictated* by [prior] precedent."  *Id*. at 301.

If the rule is indeed new, we then decide whether it falls into one of *Teague*'s two exceptions to the general bar on retroactivity.  The first exception is for substantive rules of constitutional law that place an entire category of primary conduct beyond the reach of the criminal law, including "rules prohibiting a certain category of punishment for a class of defendants because of their status or offense."  *See Penry v. Lynaugh*, 492 U.S. 302, 330 (1989).  The second exception is for "watershed rules of criminal procedure" that are necessary to the fundamental fairness of criminal proceedings.  *Teague*, 489 U.S. at 311−12.  It is generally very difficult to meet the requirements of the second exception.  *See, e.g.*, *Saffle v. Parks*, 494 U.S. 484, 495 (1990) (noting that the rule announced in *Gideon v. Wainwright*, 372 U.S. 335 (1963), illustrates the type of rule meeting this second exception).

10

Smith argues that *Moore* falls under the first *Teague* exception because *Moore* announced a new substantive rule of constitutional law that prohibits "a certain category of punishment for a class of defendants because of their status or offense." *Penry*, 492 U.S. at 330. Smith argues that *Moore*, which requires states to consider the medical community's current clinical standards to determine intellectual disability, effectively *expands* the class of people who are ineligible for the death penalty. Smith argues that *Moore*'s holding was thus substantive—not procedural. We disagree.

Substantive rules "set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State's power to impose," while procedural rules "are designed to enhance the accuracy of a conviction or sentence by regulating the *manner of determining* the defendant's culpability." *Montgomery v. Louisiana*, 136 S. Ct. 718, 729–30 (2016) (internal quotation marks omitted). For example, rules that "allocate decisionmaking authority" between judge and jury, or "regulate the evidence that the court could consider in making its decision" are procedural. *Welch v. United States*, 136 S. Ct. 1257, 1265 (2016).

*Moore* established that states cannot disregard current clinical and medical standards in assessing whether a capital defendant is intellectually disabled. *Moore* effectively narrowed the range of permissible methods—the procedure—

that states may use to determine intellectual disability.  While *Moore* may have the effect of expanding the class of people ineligible for the death penalty, it merely defined the appropriate manner for determining who belongs to that class of defendants ineligible for the death penalty.  *Moore* thus announced a new rule, but it is procedural, not substantive.[5]

Because *Moore* announced a procedural rule, it can only be retroactive if it meets *Teague*'s second exception.  Doing so is extraordinarily rare.  *See, e.g.*, *Schriro v. Summerlin*, 542 U.S. 348, 351–52 (2004).  "To fall within this exception, a new rule must meet two requirements: Infringement of the rule must

---

[5] In *Kilgore v. Secretary, Florida Department of Corrections*, this Court held that *Hall* is not a substantive rule under *Teague*.  805 F.3d 1301, 1314 (11th Cir. 2015) (relying on *In re Henry*, 757 F.3d 1151, 1161 (11th Cir. 2014)).  Alabama argues that we should rely on *Kilgore*'s reasoning to conclude that *Moore* is likewise not a substantive rule under *Teague*.  We decline to do so because the Supreme Court's decision in *Montgomery v. Louisiana* undermined a core component of *Kilgore*'s retroactivity analysis, which *Kilgore* borrowed from *In re Henry*.  In *Kilgore*, we reasoned that *Hall* was not substantive under *Teague* because it "guaranteed only a chance to present evidence, not ultimate relief."  *Kilgore*, 805 F.3d at 1314; *see also In re Henry*, 757 F.3d at 1161.  But *Montgomery* later deemed a rule substantive in nature—the rule of *Miller v. Alabama*, 567 U.S. 460 (2012), which prohibited mandatory life without parole sentences for juveniles—even though all that rule guaranteed was "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors," not a shorter sentence or parole.  *Montgomery*, 136 S. Ct. at 735 (quoting *Miller*, 567 U.S. at 465).  *Montgomery* thus stands for the proposition that a right can be substantive under *Teague* even if it only guarantees the chance to present evidence in support of relief sought, not ultimate relief itself.  *See, e.g.*, *In re Sapp*, 827 F.3d 1334, 1340–41 (11th Cir. 2016) (Jordan, Rosenbaum, and Jill Pryor, JJ., concurring).  Because *Montgomery* undermined the reasoning of *Kilgore* and *In re Henry*, we do not rely on them to reach our decision.  *See Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998); *see also Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) ("To the extent of any inconsistency between [our prior] pronouncements and the Supreme Court's supervening ones, of course, we are required to heed those of the Supreme Court.").

seriously diminish the likelihood of obtaining an accurate conviction [or sentence], and the rule must alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Tyler v. Cain*, 533 U.S. 656, 665 (2001) (quotation omitted).

Only *Gideon v. Wainwright*, 372 U.S. 335 (1963), which extended the right to counsel to criminal defendants, has been declared the kind of procedural rule that altered the "bedrock procedural elements" essential to the fairness of a proceeding. *See Beard v. Banks*, 542 U.S. 406, 416−18 (2004) (noting that *Gideon*'s holding was sweeping and broke with past precedent). The Supreme Court has continually rejected retroactivity under *Teague*'s second exception for procedural rules that do not have the "primacy" or "centrality" of *Gideon. See, e.g.*, *Wharton v. Bocking*, 549 U.S. 406, 421 (2007) (rejecting retroactivity for *Crawford v. Washington*, 541 U.S. 36 (2004)); *Schriro*, 542 U.S. at 356−58 (rejecting retroactivity for *Ring v. Arizona*, 546 U.S. 584 (2002)). Both *Crawford*[6] and *Ring*[7] were important holdings for the rights of criminal defendants, and yet

---

[6] In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Sixth Amendment's Confrontation Clause prohibits the state from introducing testimonial hearsay as evidence against criminal defendants unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant.

[7] In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that the Sixth Amendment guarantees criminal defendants the right to have a jury, not a sentencing judge, find the aggravating circumstances necessary for the imposition of the death penalty.

the Supreme Court held that neither altered the *bedrock procedural elements* essential to the fairness of a criminal proceeding, and thus neither was retroactive.

Similarly, *Moore* is an important development. It provides guidance to states attempting to comply with *Atkins*. But we cannot say that *Moore* altered the bedrock procedural elements essential to the fairness of a criminal proceeding in the way that the *Gideon* rule did. Because *Moore* cannot meet the requirements of *Teague*'s second exception, it cannot be applied retroactively.

### B. Analysis of Smith's Atkins Claim

Smith argues that, even if *Moore* is not retroactive, the Alabama courts unreasonably applied *Atkins v. Virginia* to his intellectual disability claim.

#### 1. The State Court Record

Shortly after *Atkins*, the Alabama Supreme Court held that to be intellectually disabled under *Atkins*, a defendant must prove by a preponderance of the evidence: (1) "significantly subaverage intellectual functioning (an IQ of 70 or below)," (2) "significant or substantial deficits in adaptive behavior," and (3) that both the subaverage intellectual functioning and the deficits in adaptive functioning manifested before the age of eighteen. *Ex Parte Perkins*, 851 So. 2d 453, 456 (Ala. 2002).

Smith raised his *Atkins* claim in his Rule 32 petition shortly after *Perkins*. The Rule 32 court ultimately denied his petition, finding it relevant, but not

14

dispositive, that no expert—not even Smith's own expert—testified that Smith was intellectually disabled. The court then evaluated the *Perkins* factors and concluded that Smith failed to prove by a preponderance of the evidence that he was intellectually disabled.

First, the court determined that Smith failed to satisfy his burden of showing significantly subaverage intellectual functioning. The court noted that the experts had presented conflicting evidence and testimony: Dr. Salekin reported that Smith had an IQ of 64, while Dr. King reported an IQ of 72. The court ultimately credited Dr. King's IQ score as "probably more accurate" than Dr. Salekin's score in part because Dr. King's test resulted in a verbal IQ of 75, the same verbal IQ that Smith received on a prior IQ test. The court also declined to adjust Smith's IQ scores downward because the experts all testified that there was no national medical consensus on using the Flynn Effect to adjust IQ scores.

On the second *Perkins* prong, the court determined that Smith failed to satisfy his burden of showing significant deficits in adaptive behavior. The court concluded that, "[a]lthough [Smith] showed deficits in adaptive functioning based upon test results," Smith did not show many deficits in his adaptive functioning "in everyday life" either before or after his crime. The court noted that Smith showed relatively normal scores in functional academics and communication. And while he did have some possible deficiencies, the court reasoned that those deficits were

15

not so significant that Smith could not succeed in school, work, or society in general.  The court also indicated that Smith's ability to plan and conceal his crime "weigh[ed] against [him] in relation to the adaptive functioning requirement."

On appeal, the Alabama CCA affirmed, holding that the Rule 32 court did not abuse its discretion in concluding that Smith had failed to prove that he was intellectually disabled.  *Smith III*, 112 So. 3d at 1108.  As the Alabama CCA summarized, "[t]he greater weight of the evidence indicated that, although he suffered with some mental deficiencies, they did not rise to the level at which an impartial mind would conclude from the evidence that he was mentally retarded." *Id*. at 1130.

As to intellectual functioning, the Alabama CCA found that the Rule 32 court did not err in declining to apply the Flynn Effect or standard error to Smith's IQ score.  *Id*. at 1131.  The Alabama CCA also endorsed the Rule 32 court's approach to examining adaptive functioning, explaining that "[e]ven where there are indications of shortfalls in adaptive behavior, other relevant evidence may weigh against an overall finding of deficiency." *Id.* at 1133.  Because the Alabama CCA found that Smith failed to prove both significantly subaverage intellectual functioning and significant deficits in adaptive behavior, the court did not fully address the third prong of *Perkins*—whether those shortfalls in intellectual and adaptive functioning had manifested before the age of eighteen.

16

*2. Analysis Under 28 U.S.C. § 2254(d)(1)*

Smith argues that the Alabama state courts unreasonably applied *Atkins v. Virginia* to his intellectual disability claim by (1) determining that Smith's IQ scores did not meet the standard for intellectual disability, (2) failing to consider the standard error and Flynn Effect in assessing Smith's IQ scores, and (3) giving more weight to Smith's adaptive strengths than to his adaptive deficits in assessing his adaptive functioning.

A state court's determination is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The difficulty for Smith—and other litigants mounting this challenge—is that *Atkins* set forth few legal governing principles for lower courts and states evaluating intellectual disability. The Supreme Court's decision in *Atkins* did not define what it means to be intellectually disabled, instead leaving that task to the states. *See Atkins*, 536 U.S. at 317. The Supreme Court itself recently explained that "*Atkins* gave no comprehensive definition of 'mental retardation' for Eighth Amendment purposes." *Shoop v. Hill*, 139 S. Ct. 504, 507 (2019).

*i. Intellectual Functioning*

17

Smith first argues that the Alabama state courts unreasonably applied *Atkins v. Virginia* by refusing to credit Dr. Salekin's testimony that Smith had an IQ of 64 and consequently determining that Smith's IQ scores did not satisfy the first *Perkins* prong of subaverage intellectual functioning.  According to Smith, "[t]he refusal to use the IQ score of 64 in an average with the other scores, or otherwise discount [Dr. King's] score of 72 based on the IQ score of 64, was an unreasonable application of *Atkins* to the present case."[8]  Smith also argues it was an unreasonable application of *Atkins* to refuse to account for the Flynn Effect or standard error when the state court evaluated Smith's IQ.

But *Atkins* did not set forth clearly established federal law on how states must evaluate IQ scores in determining intellectual disability.  "*Atkins* did not define intellectual disability, nor did it direct the states on how to define intellectual disability, nor, finally, did it provide the range of IQ scores that could be indicative of intellectual disability."  *Kilgore v. Sec'y, Fla. Dep't of Corr.*, 805

---

[8] In his initial brief, Smith does not argue that the Alabama court's decision to refuse to fully credit Dr. Salekin's IQ score was an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  Smith raises this argument only in his reply brief.  We generally do not consider issues and arguments raised for the first time in an appellant's reply brief.  *See, e.g.*, *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).  In any event, it is unlikely that the state court made an unreasonable factual determination in crediting Dr. King's score over Dr. Salekin's score.  While we agree that it might have been preferable to average both IQ scores under these circumstances, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 301 (2010).  Here, the state court used an additional IQ score in the record—albeit a partial score—to corroborate Dr. King's test.  We cannot say that the decision to do so was an unreasonable factual determination.

18

F.3d 1301, 1311 (11th Cir. 2015); *see also Bobby v. Bies*, 556 U.S. 825, 831 (2009) ("[*Atkins*] did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within [*Atkins*' compass]" (internal citation and quotation marks omitted)).  Without clear guidance from *Atkins*, the state court's refusal to average IQ scores or to account for certain statistical adjustments was not an unreasonable application of clearly established federal law.

Smith's specific argument about the state court's failure to consider the standard error is foreclosed by our precedent.  As we explained in *Kilgore*, "[n]othing in *Atkins* suggested that a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled."  805 F.3d at 1312.  In other words, *Atkins* did not require states to consider the standard error in assessing IQ scores.  That requirement did not emerge until *Hall v. Florida*, 572 U.S. 701 (2014), well after the Alabama courts considered Smith's case.

Altogether, Smith's arguments generally conflate what we have previously *permitted* in evaluating intellectual disability with what is *required*.  While we have previously said that the Flynn Effect *may* be considered in determining a defendant's IQ, *see Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010), neither this Court nor the Supreme Court has required courts to do so.  Similarly, while we have previously permitted district courts to average multiple IQ scores, *see*

19

*Holladay v. Allen*, 555 F.3d 1346, 1357−58 (11th Cir. 2009), courts are not necessarily required to do so.

### ii. Adaptive Functioning

Next, Smith argues that the Alabama courts unreasonably applied *Atkins* by favoring Smith's adaptive strengths over his adaptive deficits. The Supreme Court recently rejected this argument in *Shoop v. Hill*, 139 S. Ct. 504 (2019).

In *Hill v. Anderson*, the Sixth Circuit held that *Moore*'s holding about adaptive strengths was clearly established law because *Moore* was "merely an application of what was clearly established by *Atkins*." 881 F.3d 483, 487 (6th Cir. 2018). But the Supreme Court reversed the Sixth Circuit and soundly rejected this argument in *Shoop*, explaining that "*Atkins* did not definitively resolve how [the adaptive functioning prong] was to be evaluated but instead left its application in the first instance to the State." 139 S. Ct. at 508. Because *Atkins* did not provide definitive guidance to states on how to evaluate a petitioner's adaptive functioning, the Alabama courts here could not have unreasonably applied *Atkins* in choosing to weigh Smith's adaptive strengths against his adaptive weaknesses.

Smith's success on this claim is a matter of timing. After *Moore v. Texas*, it is abundantly clear that states may not weigh a defendant's adaptive strengths against his adaptive deficits. Doing so contradicts the medical community's current clinical standards. *Moore*, 137 S. Ct. at 1050−51. As the Supreme Court

20

explained in *Moore*, many individuals with intellectual disabilities have both adaptive deficits and adaptive strengths, and "significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills." *Id.* at 1050 (citation omitted).

Alabama argues that the state court did not weigh Smith's adaptive strengths against his adaptive deficits. We firmly disagree. Despite concluding that Smith "showed deficits in adaptive functioning based upon test results," the state court considered other factors that weighed against "an overall finding of deficiency," treating the adaptive functioning prong like a balancing test. In particular, the state court considered Smith's ability to conceal his crime, ability to take care of his mother, and his scores on certain mathematics and reading tests as adaptive strengths that outweighed his apparent deficits. This approach was acceptable at the time. But after *Moore*, it no longer is.

## IV. *Batson* Claim

Smith argues that the prosecutor at his state trial struck jurors on the basis of gender and national origin[9] in violation of the Sixth and Fourteenth Amendments.

---

[9] At the district court, Smith also asserted a race discrimination claim because the prosecutor used five of his peremptory strikes to eliminate black venire members. On appeal, however, Smith makes only vague and passing reference to racial discrimination. Therefore, we address only his gender and national origin discrimination claims. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (noting that "an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority").

*See Batson v. Kentucky*, 476 U.S. 79 (1986); *J.E.B. v. Alabama*, 511 U.S. 127 (1994).  After careful review, we hold that the state court's denial of Smith's claims was not contrary to *Batson* and its progeny, an unreasonable application of *Batson*, or an unreasonable determination of the facts in light of the evidence presented to the state courts.

### A. Clearly Established Law

Under the Equal Protection Clause, a criminal defendant has a constitutional right "to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria."  *Batson*, 476 U.S. at 85–86.  In *Batson*, the Supreme Court set out a three-part test to "guide trial courts' constitutional review of peremptory strikes."  *Johnson v. California*, 545 U.S. 162, 168 (2005).  Under the three-part test,

> [f]irst, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.  Second . . . the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes.  Third, if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

*Id.* (internal quotation marks, citations, and footnotes omitted).  At the first step, a defendant makes a prima facie case of discrimination if the circumstances allow for a permissible inference of discrimination.  *Id*. at 162.  At the second step, the

court evaluates only the "facial validity of the prosecutor's explanation," and unless a discriminatory intent is "inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (quotation omitted). The third step "involves evaluating the persuasiveness of the justification" proffered by the prosecutor, and "[a]t that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* Inconsistent and disparate treatment of venire members is evidence that the proffered reasons are post-strike excuses and not legitimate race or gender-neutral justifications. *See, e.g.*, *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008).

The evaluation of a prosecutor's race-neutral or gender-neutral explanation for a strike under *Batson* is a "pure issue of fact . . . peculiarly within a trial judge's province." *McNair v. Campbell*, 416 F.3d 1291, 1310 (11th Cir. 2005) (quotation omitted). Even on direct review, a trial judge's finding on intentional discrimination is entitled to "great deference." *See Batson*, 476 U.S. at 98 n.21. At the habeas stage, the burden is even higher; the petitioner must show "it was unreasonable to credit the prosecutor's race-neutral explanations" under § 2254(d)(2). *Rice v. Collins*, 546 U.S. 333, 338 (2006).

*B. Analysis of Smith's* Batson *Claim*

23

Smith argues that the state court's determination that he failed to prove purposeful discrimination was (1) an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) and (2) both contrary to and an unreasonable application of *Batson* and its progeny under 28 U.S.C. § 2254(d)(1). Before we address those claims, we briefly review the state court record.

*1. State Court Record*

On remand, the prosecutor offered explanations for striking each female venire member. Those explanations included employment, marital status, age, knowledge of criminal law, and work with various churches and religious groups. In its order on remand, the state trial court evaluated the prosecutor's reasoning for striking each female venire member. The trial court found that the prosecutor's explanation for each member was supported by the record. The court confirmed, for example, that each woman allegedly struck for her religious affiliations stated during voir dire, or indicated on her questionnaire, that she was active in her church or taught Sunday School. The court noted that excluding potential jurors who were susceptible to mercy arguments was a sound trial strategy. Further, where the prosecutor explained a strike based on a venire member's demeanor, the trial court corroborated the prosecutor's explanation with its own trial notes. The state trial court ultimately held that the prosecutor's reasons for striking the female venire members were gender neutral, that those reasons were credible, and that

24

Smith had failed to prove that the prosecutor had acted in a discriminatory manner.[10]

On appeal, the Alabama CCA concluded that the trial court's determination was not clearly erroneous. *Smith II*, 838 So. 2d at 436, 466. The Alabama CCA focused its analysis on four women who, according to the prosecutor, were eliminated because of their religious affiliations. The court noted that three of the four women were Sunday School teachers; the other was a Counselor of Ministry. *See id.* at 426−27.

The Alabama CCA then acknowledged Smith's argument that the prosecutor's stated reason for striking these jurors was pretextual. The court considered, for example, Smith's argument that several women who had been eliminated for church involvement had also previously affirmed that their religious beliefs would not preclude them from imposing a death sentence. The Alabama CCA also considered Smith's argument that the prosecutor had not asked the

---

[10] At the end of his order, the state trial court judge also noted that the prosecutor was "certainly not a person prone to strike minorities denounced in the *Batson* case and its progeny." The judge based this conclusion on his "extensive in court experience with [the prosecutor] and close acquaintanceship with others that know him." We note that the court's role in hearing a *Batson* claim is to evaluate whether the prosecutor's stated reasons for excluding members of the jury are credible and supported by the record, not to personally attest to the prosecutor's character or to provide its own reasons for why the prosecutor could not have discriminated in the present case. *See Adkins v. Warden, Holman CF*, 710 F.3d 1241, 1254 & n.11 (11th Cir. 2013) (indicating that, at *Batson*'s third step, it is improper for the trial court to rely on its personal experience with and opinion about the reputation of a prosecutor where those facts are not in evidence).

25

women follow-up questions about their religious beliefs before striking them.  But after taking those arguments into account, the court found that Smith had not shown that the trial court's credibility determination was clearly erroneous.  The Alabama CCA thus affirmed the trial court's finding that the prosecutor's reasons for striking the jurors were nondiscriminatory.  *Id*. at 436.

*2. Analysis Under 28 U.S.C. § 2254(d)(2)*

A prosecutor's motive for striking a juror is a factual issue, *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), and a state court's factual findings are presumed correct on federal habeas corpus review.  28 U.S.C. §§ 2254(d)(2), (e)(1).  In seeking habeas relief, Smith bears the burden of rebutting that presumption by "clear and convincing evidence."  *Id.* § 2254(e)(1).

Smith first argues that he presented a strong prima facie case of gender discrimination where the prosecutor used 14 of his 15 strikes to eliminate women from the jury.  We agree with Smith.[11]

Smith then argues that the state court's determination that the prosecutor's reasons for striking the female venire members were nondiscriminatory was an unreasonable determination of the facts, particularly in light of the prosecutor's

---

[11] The district court found that Smith presented a relatively weak prima facie case of gender discrimination in part because five women ultimately served on Smith's jury.  But the fact that five women remained on the jury after the prosecutor used nearly all his strikes to eliminate women tells us more about the initial composition of the venire pool (and which juror slots in the venire were filled by women) than it does about the prosecutor's state of mind.

inconsistent treatment of male and female venire members. Smith concentrates his argument on one man—misidentified in the trial transcript as "Mr. Johnson"—who stated during voir dire that he was a member of his church's board.[12] The prosecutor did not use a strike on "Johnson," which Smith argues is evidence that the prosecutor's explanation for striking these women was pretextual.

In the years following Smith's trial, no party has been able to determine Johnson's true identity. Smith was thus unable to provide the state courts with any additional information about Johnson that might have been used to determine whether there were meaningful differences between him and the female venire members. We do not know Johnson's other answers during voir dire, information about his demeanor, or any other potentially relevant factors, such as his occupation. All that we know about Johnson is that he was a board member at his church.

To succeed under § 2254(d)(2), Smith must show that it was unreasonable for the state court to credit the prosecutor's proffered explanations for the strikes. *See Rice*, 546 U.S. at 338. Smith has not met this burden. While Smith's evidence about Johnson could have supported a finding that the prosecutor's strikes were

---

[12] The venire pool for Smith's trial did not contain any member with the surname of Johnson, and thus we assume this venire member was misidentified in the trial transcript.

discriminatory, we do not think it mandated such a finding in light of the limited evidence presented to the state court.

The Alabama CCA also grappled with some of Smith's other arguments for pretext. The court considered, for example, that some of the women allegedly eliminated because of their church involvement had previously affirmed that their religious beliefs would not preclude them from imposing the death penalty. But the state court did not find that factor dispositive. Neither do we. The prosecution's explanation at the *Batson* hearing was not that these potential jurors would be unalterably unwilling to impose the death penalty, but that they would be particularly receptive to Smith's counsel's request for mercy at the penalty phase of the trial. This is an acceptable justification for a peremptory strike.

Importantly, the Alabama CCA ultimately affirmed the trial court's credibility determination only after noting that the trial court found that (1) the prosecutor's reasons for striking venire members were supported by the record and (2) the prosecutor's approach in excluding those who were susceptible to mercy arguments was a sound trial strategy. Both factors are relevant in assessing a prosecutor's credibility. *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.").

28

Ultimately, the record before us does not "compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's [gender]-neutral justifications." *Rice*, 546 U.S. at 341. Because habeas review does not allow us to "supersede the trial court's credibility determination" where the record does not compel a contrary conclusion, *see id*. at 341–42, we must deny Smith's challenge under § 2254(d)(2).

*3. Analysis Under 28 U.S.C. § 2254(d)(1)*

Next, Smith argues that the state court's holding was both contrary to *Batson* and its progeny and an unreasonable application of *Batson* under 28 U.S.C. § 2254(d)(1). First, Smith argues that, contrary to *Batson*'s directive, the Alabama CCA simply accepted the prosecutor's proffered explanations at face value. We disagree. The Alabama CCA thoroughly documented the prosecutor's reasons for strikes, the trial court's corroboration of the prosecutor's stated reasons, and Smith's arguments for why those reasons were pretextual. Only after conducting this analysis did the Alabama CCA affirm the trial court's credibility determination.[13]

---

[13] We acknowledge that in its opinion, the Alabama CCA did not specifically discuss Johnson. But the court did analyze whether the prosecutor's explanation about striking jurors based on church affiliation was pretextual. "Under Supreme Court and our Circuit precedent, a state court's written opinion is not required to mention every relevant fact or argument in order for AEDPA deference to apply." *Lee v. Comm'r, Ala. Dep't of Corr*., 726 F.3d 1172, 1223 (11th Cir. 2013). Here, we do not think that the Alabama CCA was required to explicitly address Smith's arguments about Johnson given the limited evidence Smith provided about him.

Next, Smith argues that the Alabama CCA erred in accepting the prosecution's "arbitrary and vague" reasons for excluding Ms. Ramos, the only Hispanic venire member. While Smith is correct that vague explanations may be legally insufficient to rebut a prima facie case of discrimination, the prosecutor's proffered reasons for striking Ms. Ramos—her youth and lack of participation in voir dire—are relatively concrete and permissible[14] reasons for exercising a peremptory strike. The trial record supports both explanations. And neither explanation rises to the level of vagueness that we condemned in *United States v. Horsley*, 864 F.2d 1543 (11th Cir. 1989), on which Smith relies.[15]

Finally, Smith argues that it was improper for the trial court to consider its own observations about a venire member's behavior. It would be improper for a judge to substitute its own reasoning for striking a venire member where the prosecution's explanations do not suffice. *See Dretke*, 545 U.S. at 252. But that did not occur here. On remand, the trial court noted its own observations about venire members from voir dire, but it did so to corroborate the prosecutor's own explanations about a venire member's demeanor—a method endorsed by the Supreme Court. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("[R]ace-

---

[14] The Supreme Court has not extended *Batson* to peremptory challenges based on age. *See, e.g.*, *Weber v. Strippit, Inc.*, 186 F.3d 907, 911 (8th Cir. 1999), *cert. denied*, 528 U.S. 1078 (2000).
[15] In *United States v. Horsley*, we held that a prosecutor's statement that "I've just got a feeling about [the juror]" was too vague to rebut a prima facie case of discrimination. 864 F.2d at 1544.

30

neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's firsthand observations of even greater importance.  In this situation, the trial court must evaluate . . . whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.").

In sum, Smith has not established that the state court's denial of his claims was contrary to the standard laid out in *Batson* and its progeny, an unreasonable application of *Batson*, or an unreasonable determination of the facts in light of the evidence presented to the state courts.  We therefore affirm the district court's denial of Smith's § 2254 petition.

**AFFIRMED.**