[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-13020

_____

D.C. Docket No. 2:10-cv-02218-LSC

EUGENE MILTON CLEMONS, II,

Petitioner - Appellant,

versus

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS,
WARDEN, HOLMAN CF,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 30, 2020)

Before WILSON, JILL PRYOR and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In 1994, an Alabama jury convicted Eugene Clemons for the capital murder of Drug Enforcement Administration Special Agent George Douglas Althouse. Thereafter, a unanimous jury recommended that Clemons be sentenced to death; the state trial court followed the jury's recommendation and sentenced the petitioner to die.  Nearly a decade later, the Supreme Court held it unconstitutional to execute intellectually disabled people.  See Atkins v. Virginia, 536 U.S. 304 (2002).  After Atkins, Clemons timely brought a claim of intellectual disability in Alabama state court.  The Alabama courts concluded that Clemons had failed to demonstrate either significant subaverage intellectual functioning or significant deficits in adaptive functioning, as required by Atkins and Alabama case law, and denied the petition.  Because the state court's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented, we are obliged to deny his federal habeas petition.

Clemons also attempts to bring thirty-one other claims in his federal habeas petition, but those claims are untimely.  The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires most claims to be brought within one year of a conviction becoming final on direct review.  A "properly filed" state-court petition tolls the one-year federal limitations period.  But Clemons's state petition was not "properly filed" -- because his attorneys neither paid the filing fee nor filed a

2

motion to proceed without paying the fee -- until more than one year after his conviction had become final.  Clemons now says his lawyer received misinformation from the state court clerk's office, so the federal limitations period should be equitably tolled.  But the extraordinary remedy of equitable tolling cannot excuse the simple negligence of an attorney.  We affirm the district court's determination that those thirty-one claims are untimely and must be dismissed.

## I.  Background

On May 28, 1992, Eugene Milton Clemons II shot and killed DEA Special Agent George Douglas Althouse during a carjacking.  That evening, Althouse and Naylor Braswell, a Jefferson County Sheriff's Department officer with whom Althouse was working and sharing an apartment, drove a black Camaro to meet another narcotics officer.  On the way, they pulled into a service station.  Braswell went inside to borrow a telephone book while Althouse remained in the passenger's seat of the car.  Braswell looked outside and saw a man get into the driver's seat of the car, armed with a revolver.  At trial, he identified Clemons as looking like the man he saw behind the steering wheel.  He then heard two shots and saw Althouse dive out of the car.  Althouse had been shot, and although he initially returned fire, he eventually succumbed to his injuries and died.  Braswell added that a bulletproof vest and a shotgun had been in the Camaro's trunk.

One of Clemons's accomplices, Kenny Reed, also testified at trial. Clemons called him at their mutual friend Herman Shannon's house and asked Reed to pick him up to get "a car." Reed said they drove to an area near a service station and Clemons got out of the car. Reed later heard two gunshots, followed a short time later by several more shots. Clemons then drove off in a black Camaro. When Reed returned to Shannon's house, Clemons was there and said that "no one better open their mouths" because he had killed a DEA agent. Clemons had previously told Reed that Clemons's car needed a new motor.

The following day, on May 29, 1992, the black Camaro was recovered near Shannon's house and the shotgun that had been in the trunk of the car was discovered near Clemons's home. Shortly thereafter, Clemons was arrested in Cleveland, Ohio. His uncle who lived there testified that Clemons's sister had called to say Clemons was coming to Cleveland. Clemons told his uncle that he shot a police officer because the officer was trying to kill him and that he stole the car to get away.

Because Althouse was a federal narcotics officer, Clemons was first tried for murder in federal district court. He was convicted in April 1993 and sentenced to life without parole. The federal conviction was upheld on direct appeal. United States v. Clemons, 32 F.3d 1504 (11th Cir. 1994), cert. denied, 514 U.S. 1086 (1995). In a parallel proceeding, Alabama indicted Clemons for capital murder in

4

March 1993.  He was tried and convicted on September 25, 1994, and sentenced to death soon thereafter.  Clemons's direct appeals from his state-court conviction and death sentence became final when the United States Supreme Court denied his petition for certiorari on January 25, 1999.  Clemons v. Alabama, 525 U.S. 1124 (1999).

On December 27, 1999, Clemons submitted his petition for post-conviction relief, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, in Shelby County Circuit Court.  At that time, however, he neither paid a filing fee, nor moved to proceed in forma pauperis, nor finally did he include a certified copy of his prison account showing his indigency.  Clemons says the clerk of the court advised his counsel that there was no filing fee required for a Rule 32 petition.  On January 28, 2000, Clemons refiled his Rule 32 petition, only this time along with a request to proceed in forma pauperis and a certified copy of his prison account and a completed nine-page form that is contained in the Rule 32 appendix.  After allowing Clemons to amend his petition twice, the circuit court held a limited evidentiary hearing, allowing each party to depose only one witness.  The circuit court denied relief on all claims.

At the time of Clemons's trial and the initial filing of his Rule 32 petition, Supreme Court precedent had held that the execution of intellectually disabled persons was not per se unconstitutional.  See Penry v. Lynaugh, 492 U.S. 302, 340

5

(1989) (plurality opinion).  But on June 20, 2002, the Court decided Atkins v. Virginia, holding that it is categorically unconstitutional to execute someone who is intellectually disabled.[1]  536 U.S. at 321.  The substantive constitutional rule announced in Atkins applies retroactively on collateral review.  See, e.g., In re Holladay, 331 F.3d 1169, 1173 (11th Cir. 2003) ("At this point, there is no question that the new constitutional rule . . . formally articulated in Atkins is retroactively applicable to cases on collateral review.").

Because Atkins was decided after the circuit court's denial of his Rule 32 petition, but before his appeal to the Alabama Court of Criminal Appeals, Clemons argued for the first time on appeal that his death sentence was unconstitutional because of his intellectual disability.  However, Clemons had advanced a related argument, based on the same underlying facts, in his initial Rule 32 petition, claiming that his counsel was ineffective at trial for having failed to present mitigating evidence of his limited mental capacity.

On August 29, 2003, the Alabama Court of Criminal Appeals remanded Clemons's case to the circuit court with instructions to conduct an evidentiary hearing and make written findings on both his Atkins claim and the ineffective-

---

[1] Although Atkins uses the term "mentally retarded," the Supreme Court has since adopted the term "intellectually disabled" to describe the same condition.  See Hall v. Florida, 572 U.S. 701, 704 (2014) ("Previous opinions of this Court have employed the term 'mental retardation.'  This opinion uses the term 'intellectual disability' to describe the identical phenomenon.").  We too now use the term "intellectually disabled."  Kilgore v. Sec'y, Fla. Dep't of Corr., 805 F.3d 1301, 1303 n.1 (11th Cir. 2015).

assistance-of-counsel claim based on his trial attorneys' failure to present mitigating evidence of his intellectual disability.  See Clemons v. State, 55 So. 3d 314, 322 (Ala. Crim. App. 2003).

The circuit court conducted an extensive evidentiary hearing on Clemons's Rule 32 petition from June 15 to June 18, 2004.  Over the four-day hearing, the court heard testimony from four witnesses: Dr. Charles Golden (Clemons's medical psychological expert); Joseph Chong-Sang Wu (Clemons's PET brain scan expert); Dr. Helen Mayberg (Alabama's PET brain scan expert); and Dr. David Glen King (Alabama's medical psychological expert).

The evidence pertinent to Clemons's Atkins claim included seven intelligence quotient ("IQ") tests.  His scores on those tests, discussed in more detail in section III.B.1 of this opinion, varied widely from a score of 84 to a score of 51, and in several instances the administrators of the tests opined that the scores were invalid because Clemons was "malingering," that is, he intentionally frustrated the efficacy of the IQ test.  As for adaptive functioning, only Clemons's medical expert testified.  He had administered a test of adaptive functioning -- the Adaptive Behavior Assessment System test -- and found Clemons severely deficient in six of the ten behavioral areas the test covers.

On October 28, 2004, the Shelby County Circuit Court denied Clemons's petition, adopting nearly verbatim a 90-page proposed order submitted by the state.

7

On June 24, 2005, the Alabama Court of Criminal Appeals affirmed.  See Clemons v. State, 55 So. 3d 314, 322–32 (Ala. Crim. App. 2005).  The Court of Criminal Appeals laid out the circuit court's findings and analysis on the Atkins claim verbatim, and adopted them:

> We have reviewed the record in light of [relevant Alabama precedents], and we conclude that it supports the circuit court's findings.  Therefore, we adopt those findings as part of this opinion.  Based on the record before us, we conclude that, even under the broadest definition of mental retardation, the appellant is not mentally retarded and that imposition of the death penalty in this case would not be unconstitutional.

Id. at 332.

Intervening appeals relating to procedural bar on the ineffective-assistance-of-counsel claim (which are not relevant here) took the case back and forth between the Court of Criminal Appeals and the Alabama Supreme Court for several years.  Finally, on August 13, 2010, the Alabama Supreme Court denied Clemons's petition for certiorari without opinion.  Ex parte Clemons, No. 1070535 (Ala. Aug. 13, 2010) (per curiam).

Three days later, on August 16, 2010, Clemons set his sights on the federal district court, filing the instant habeas petition in the United States District Court for the Northern District of Alabama, pursuant to 28 U.S.C. § 2254.  On the same day, he filed a successive Rule 32 petition in Alabama circuit court.  See Clemons v. State, 123 So. 3d 1, 3 (Ala. Crim. App. 2012).  The federal petition was stayed and held in abeyance while Clemons exhausted his successive state petition.  The

8

Court of Criminal Appeals rejected Clemons's successive petition and found that the claim he raised -- the jury must be allowed to consider his low IQ as part of mitigation evidence -- was procedurally defaulted. Id. at 12. That petition was resolved on March 22, 2013, when the Alabama Supreme Court denied certiorari. Ex parte Clemons, No. 1120150 (Ala. Mar. 22, 2013). Thus, the only reasoned state court opinion relevant to this appeal is the Alabama Court of Criminal Appeals's June 24, 2005 ruling, affirming the state court's determination that Clemons was not intellectually disabled, and thus that the imposition of the death penalty was not unconstitutional.

With the federal habeas action no longer stayed, Alabama moved to dismiss it, arguing that it had been filed untimely because it was past AEDPA's one-year limitations period. The district court denied the motion as to Clemons's Atkins claim, but granted it as to all the other claims he made because they were untimely and equitable tolling was not warranted. The court reached this conclusion because Clemons had established nothing more than negligence on the part of his counsel. In a subsequent order, the district court denied relief on the Atkins claim, concluding that the state court's determinations were neither contrary to nor an unreasonable application of clearly established law, nor were they based on an unreasonable determination of the facts in light of the evidence presented. The

9

district court highlighted the credibility determinations made by the state circuit court and found that those determinations were not objectively unreasonable.

## II.  Standard of Review

"We review de novo a district court's grant or denial of a habeas corpus petition."  McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005).  Because Clemons filed his federal habeas petition after April 24, 1996, this case is governed by AEDPA.  "Under AEDPA, if a state court has adjudicated the merits of a claim -- as the state court did here -- we cannot grant habeas relief unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Kilgore v. Sec'y, Fla. Dep't of Corr., 805 F.3d 1301, 1309 (11th Cir. 2015) (quoting 28 U.S.C. § 2254(d)).[2]

---

[2] Pursuant to § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Under § 2254(d)(1)'s 'contrary to' clause, we grant relief only 'if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" Jones v. GDCP Warden, 753 F.3d 1171, 1182 (11th Cir. 2014) (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)).  "Under § 2254(d)(1)'s 'unreasonable application' clause, we grant relief only 'if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Id. (alteration in original) (quoting Williams, 529 U.S. at 413).  Here, there is no dispute that the state court identified the correct legal principle applicable to the only timely claim before us (Atkins itself), so this case implicates the "unreasonable application" clause of § 2254(d)(1).

Section 2254(d)(2) requires that we afford a state trial court's fact-finding substantial deference.  Brumfield v. Cain, 576 U.S. 305, 314 (2015).  "If '[r]easonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (alteration and ellipsis in original) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

### III.  Analysis

11

A.  Thirty-One of Clemons's Claims are Untimely

The district court dismissed thirty-one of Clemons's federal habeas claims as untimely pursuant to AEDPA's one-year statute of limitations.  28 U.S.C. § 2244(d)(1).  The one-year limitations period ran out when Clemons failed to properly file his state habeas petition, which would have tolled the federal limitations period under AEDPA, within one year of his judgment of conviction becoming final on direct review.  Although Clemons filed his state petition within one year, he failed to either pay a filing fee or move to proceed in forma pauperis ("IFP").  Thus, his petition was not "properly filed" in accordance with Alabama law.  By the time he properly filed the petition with the required motion to proceed IFP, the one-year federal limitations period had run.

Clemons concedes that all of the claims in his habeas petition, but for his Atkins claim, are barred from consideration under AEDPA's one-year limitation. He argues, however, that the federal limitations period should be equitably tolled because his counsel received misinformation from an unnamed person working in the state court clerk's office.  That employee allegedly told Clemons's counsel he was neither required to pay a filing fee nor required to file a motion to proceed IFP. But because Clemons was represented by counsel, and because a petitioner is bound by the negligence of his attorney, Clemons is not entitled to equitable tolling.  Thus, we affirm the district court's dismissal of those thirty-one claims.

Under § 2244(d), "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1).  For claims that could have been brought immediately -- because the constitutional right existed at the time and the factual predicate was discoverable through the exercise of due diligence -- the limitations period runs from the date the conviction becomes final on direct review.  See id. § 2244(d)(1)(A)–(D).  Clemons's conviction became final on January 25, 1999, when the United States Supreme Court denied certiorari.

However, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  Id. § 2244(d)(2).  Put more plainly, a "properly filed" state habeas petition pauses the clock on the one-year limitations period until that state petition is resolved.  If, for example, a petitioner properly files a state habeas petition six months after his conviction becomes final on direct review, he still has six months to file his federal habeas petition after the state courts finally resolve the petition.

But Clemons's state petition was not "properly filed" until after the federal habeas limitations period had expired.  Rule 32.6 of the Alabama Rules of Criminal Procedure sets forth the requirements for properly filing a postconviction petition, including these:

13

"[The petition] <u>shall</u> . . . be accompanied <u>by the filing fee prescribed by law or rule in civil cases in the circuit court unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis</u>. If the petitioner desires to prosecute the petition in forma pauperis, he or she shall file the "In Forma Pauperis Declaration" at the end of the form. In all such cases, the petition shall also be accompanied by a certificate of the warden or other appropriate officer of the institution in which the petitioner is confined, stating the amount of money or securities on deposit to the petitioner's credit in any account in the institution for the previous twelve (12) months, which certificate may be considered by the court in acting upon the petitioner's application for leave to proceed in forma pauperis. If the application to proceed in forma pauperis is granted, the filing fee shall initially be waived, but may be assessed as provided in Rule 32.7(e). <u>Upon receipt of the petition and the filing fee, or an order granting leave to the petitioner to proceed in forma pauperis, the clerk shall file the petition</u> and promptly send a copy to the district attorney (or, in the case of a petition filed in the municipal court, to the municipal prosecutor).

Ala. R. Crim. P. 32.6(a) (emphases added). In 1999, there was a $140 filing fee for civil cases filed in circuit court in Alabama. <u>See</u> 1999 Ala. Laws Act 99-427 (H.B. 53), Ala. Code § 12-19-71 (1999); <u>see also</u> <u>Ex parte Hurth</u>, 764 So. 2d 1272, 1274 (Ala. 2000) ("The docket fee for the filing of a petition for post-conviction relief is $140.00.").

Clemons admits that he attempted to file his Rule 32 petition on December 27, 1999 without either a filing fee or a motion to proceed IFP. The initial filing contained the following request for relief: "Provide Mr. Clemons, who is indigent and incarcerated, funds sufficient to present witnesses, experts, and other evidence in support of the allegations in this Petition and any amendments thereto." But this request did not mention a filing fee or request any kind of waiver of the fee, and

though it did reference Clemons's indigent status, it did not provide the required certified copy of his prison account necessary for an IFP request. Notably, the omission was not remedied by counsel until the following month, when Clemons filed another copy of the Rule 32 petition with an explicit request to proceed IFP on January 28, 2000, accompanied by a certified copy of his prison account -- three days after the federal limitations period had expired. The circuit court noted in its case action summary that Clemons's petition was "filed" on January 28, 2000. On March 14, 2000, Clemons filed a motion in state court to correct what he termed a "clerical error" in the notation, asking the court to direct the clerk to docket his Rule 32 petition as having been filed on December 27, 1999, obviously anticipating the timeliness issues in federal habeas proceedings. Alabama at the time had a two-year statute of limitations, so the petition was timely in the Alabama courts.

In an accompanying affidavit and at a state court hearing on the motion, local counsel for Clemons at the time, James S. Christie, Jr., associated with the law firm of Bradley Arant, explained that he was prepared to file the petition on December 23, 1999. Because it was proving difficult to have the prison process the paperwork to execute Clemons's IFP motion, he told Clemons's out-of-state counsel at the law firm of Winston & Strawn, that he would pay the fee and file the petition. Christie's secretary could not determine the amount of the fee, so Christie

called the circuit court clerk's office to ask. He thought it was reasonable to call the clerk's office because filing fees differ from county to county, in part because of a library tax that is assessed differently in each court, making it impossible to determine the exact amount of the fee from statute alone. When he called, he spoke to a woman in the clerk's office, though he could not remember her name or the precise words of their conversation. Christie said at the hearing that he was familiar with the people in the clerk's office and that his understanding was that "nobody down there remembers talking to" him. He claimed, however, that he "understood" from their conversation that a fee was not necessary to file the petition, so he had his firm's runner file it without a fee. It "made sense" to him because Clemons had already been granted IFP status in the underlying case. In early January, he saw a copy of the petition stamped "Dec 1999 received & filed," so he believed it had been properly filed.

According to Clemons's counsel, later investigation revealed not only that the petition was not filed by the clerk, but also that the clerk's office apparently lost it for approximately four months, and the petition was never docketed. On January 24, 2000, one day before the AEDPA one-year limitation period would expire, Clemons's counsel mailed to the state court an IFP motion in anticipation of other fees expected in the litigation. He also submitted an amended Rule 32 petition, which contained no substantive changes but merely inserted the identical

16

petition into the state court's Rule 32 template.  Clemons says the petition was mailed rather than hand-delivered because counsel had no notice of any filing deficiencies in the December 1999 petition.  The clerk of court received the IFP petition and the amended Rule 32 petition on January 28, 2000 and docketed them on that date.  Months later, in April 2000, the original filing was found, and it was docketed as though it had also been filed on January 28, 2000.  The Shelby County Circuit Court issued a minute order on the docket in May 2000 that read: "Petitioner's Motion to Correct Clerical Error: Denied, as the Court finds the Defendant's Rule 32 petition was properly filed on January 28, 2000."  The Alabama Court of Criminal Appeals affirmed the denial of the motion.

Clemons's counsel does not dispute that Alabama law required his Rule 32 petition to be accompanied by a filing fee or a motion to proceed IFP -- that is, he does not dispute that the petition was not "properly filed" until January 28, 2000.  Thus, it is crystal clear that statutory tolling pursuant to § 2244 is unavailable to Clemons.  Rather, Clemons says he is entitled to equitable tolling because of the misinformation his attorney allegedly received when he called the clerk's office.

Equitable tolling "is an extraordinary remedy limited to rare and exceptional circumstances" and typically should be "applied sparingly."  Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1221 (11th Cir. 2017) (quotations omitted); see also Holland v. Florida, 560 U.S. 631, 649 (2010); Lawrence v. Florida, 549 U.S. 327, 336

17

(2007); Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009) (per curiam); Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000). Indeed, equitable tolling may only be applied where there are "extraordinary circumstances that are both beyond [the petitioner's] control and unavoidable even with diligence." Lawrence v. Florida, 421 F.3d 1221, 1226 (11th Cir. 2005) (quoting Sandvik v. United States, 177 F.3d 1269, 1271 (11th Cir. 1999)), aff'd, 549 U.S. 327. Moreover, the petitioner seeking equitable tolling bears the burden of demonstrating that he is entitled to it. Drew v. Dep't of Corr., 297 F.3d 1278, 1286 (11th Cir. 2002), overruled on other grounds as recognized by Jones v. Sec'y, Fla. Dep't of Corr., 906 F.3d 1339, 1351 (11th Cir. 2018). Under Supreme Court law, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (quotations omitted); see also Helton v. Sec'y for Dep't of Corr., 259 F.3d 1310, 1312 (11th Cir. 2001) (per curiam) ("Equitable tolling can be applied to prevent the application of the AEDPA's statutory deadline when extraordinary circumstances have worked to prevent an otherwise diligent petitioner from timely filing his petition." (quotation omitted)). Clemons has not met his burden.

We begin with the critical fact that Clemons was represented by counsel when he failed to properly file his Rule 32 petition within the one-year AEDPA

18

statute of limitations.  Put another way, this is a case in which an attorney made a mistake.  As we have held, "attorney negligence, even gross or egregious negligence, does not by itself qualify as an 'extraordinary circumstance' for purposes of equitable tolling; either abandonment of the attorney-client relationship, such as may have occurred in Holland, or some other professional misconduct or some other extraordinary circumstance is required." Cadet, 853 F.3d at 1226–27 (emphases omitted)); see Maples v. Thomas, 565 U.S. 266, 281 (2012).  Whatever can be said about the negligence of Clemons's attorney, it is clear it was just that, negligence.  Clemons nonetheless argues that the negligence of his counsel should be excused and the limitations period equitably tolled because he received misinformation from an unnamed clerk.  While we have extended the extraordinary remedy of equitable tolling in limited cases where misinformation from the state causes a pro se petitioner to miss a filing deadline, Clemons was not a pro se petitioner.  He had counsel.  And although his counsel negligently relied on the advice of an unnamed person in the clerk's office in the face of clear statutory filing requirements, this brings us to the end of the analysis: Clemons is bound by the negligence of his counsel and thus, he is not entitled to equitable tolling.

The cases implicating attorney negligence or mistake are clear: negligence is not enough to warrant equitable tolling.  The Supreme Court has repeatedly held

19

"that 'a garden variety claim of excusable neglect,' such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." Holland, 560 U.S. at 651–52 (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) and Lawrence, 549 U.S. at 336); see also Smith v. Comm'r, Ala. Dep't of Corr., 703 F.3d 1266, 1271 (11th Cir. 2012) (per curiam) ("As to exceptional circumstances, the general rule is that 'when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause.'" (quoting Maples, 565 U.S. at 281)).

"[T]here are circumstances where 'an attorney's unprofessional conduct can . . . count as an "extraordinary circumstance" justifying equitable tolling.'" Smith, 703 F.3d at 1271–72 (quoting Maples, 565 U.S. at 281); see also Holland, 560 U.S. at 649–52 (rejecting a per se rule that "grossly negligent" attorney conduct can never amount to a showing of extraordinary circumstances). But the controlling case law is clear on this point: attorney mistakes are generally attributable to a client by agency principles; because the attorney acts as his client's agent, the client is bound by the mistakes of the attorney.

In Holland, for example, the petitioner's attorney waited until there were twelve days remaining of the one-year limitations period to file the state petition; he failed to communicate with his client despite his client's repeated attempts to

20

address the timing problem; and he failed to inform his client of the state court's ultimate denial of his state petition, despite the client having written repeatedly to plead for information, including citing AEDPA in his correspondence and expressing specific concerns about timeliness.  See Holland, 560 U.S. at 635–43. The attorney in Holland finally responded to his client but only weeks after the limitations period had expired telling him -- incorrectly -- that the AEDPA limitations period had expired before the attorney's appointment.  Id. at 641.  And, in Maples, the petitioner's pro bono counsel left their New York law firm while the state petition was pending, were unable to represent Maples under the terms of their new employment, and failed to either inform Maples or seek leave of court to withdraw.  565 U.S. at 270–71.  The state court clerk sent notice of the denial of Maples's state petition to those attorneys, but it was returned as undeliverable, and Maples consequently failed to timely appeal the denial.  Id. at 271.  There, the Supreme Court concluded that Maples had been "left without any functioning attorney of record."  Id. at 288.  In other words, he had been abandoned.

Applying this standard, we have refused to equitably toll statutes of limitations where there was even gross negligence on the part of counsel.  In Cadet, we refused to equitably toll a limitations period where the petitioner's lawyer had misinterpreted the language of § 2244 and failed to do even rudimentary research after his client repeatedly questioned his calculation.  853

21

F.3d at 1219–20. We explained that while the attorney's conduct was grossly negligent, "he did not withdraw from representing Cadet, renounce his role as counsel, utterly shirk all of his professional responsibilities to Cadet, or walk away from their attorney-client relationship." Id. at 1234; see also Thomas v. Att'y Gen., Fla., 795 F.3d 1286, 1293–94 (11th Cir. 2015) (noting that the relevant inquiry "is not whether an attorney's mistake or oversight was egregious," but rather "whether the attorney, through her conduct, effectively abandoned the client," and remanding for the district court to apply the correct standard).

In this case, it was clearly negligent for Clemons's attorneys to fail to investigate the statutory filing fee and rely simply on the representations of an unnamed person in the clerk's office. For starters, the requirements set forth in Rule 32.6(a) of the Alabama Rules of Criminal Procedure are clear and unambiguous. The petition "shall . . . be accompanied by the filing fee prescribed by law or rule in civil cases in the circuit court unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis." Ala. R. Crim. P. 32.6(a) (emphases added). And if the petitioner seeks to prosecute the petition in forma pauperis, he is required to file the "In Forma Pauperis Declaration" at the end of the form, along with a statement concerning his prison account. Id. Counsel for Clemons easily could have paid the filing fee or could have filed an in forma pauperis motion along with a certified copy of the petitioner's prison

account when he filed the Rule 32 petition on December 27, 1999.  In fact, he filed these same documents on January 28, 2000.  While it may be true that filing fees differ from county to county because the Alabama Code authorizes local courts to assess local fees above the statutory filing fee, a diligent lawyer could plainly see that the filing fee was at minimum $140, as set forth in the Alabama Code, and that the only way to avoid paying the fee was to file a properly supported motion to proceed IFP.

What's more, even a rudimentary inquiry would have revealed that the duties of the circuit clerk's office in Alabama as defined in Rule 4 of the Judicial Administration Rules and in sections 12-17-93 and -94 of the Code of Alabama do not include the requirement that the clerk inform counsel how to file a document that complies with Alabama's rules of procedure.  Alabama's case law has made that point crystal clear.  See Smith v. Cowart, 68 So. 3d 802, 812 (Ala. 2011); Ex parte Strickland, 172 So. 3d 857, 859–60 (Ala. Civ. App. 2014).

Clemons nevertheless urges us to apply our law equitably tolling statutes of limitations for pro se litigants who rely on misinformation from court or state officials.  See Spottsville v. Terry, 476 F.3d 1241, 1245–46 (11th Cir. 2007) (equitably tolling AEDPA's statute of limitations where the state habeas court advised a pro se petitioner to file his appeal in the wrong state court, and the petitioner followed the state court's misleading advice); Knight v. Schofield, 292

23

F.3d 709, 710–11 (11th Cir. 2002) (per curiam) (equitably tolling AEDPA's statute of limitations where a pro se petitioner did not receive notice of the Georgia Supreme Court's denial of his habeas petition for eighteen months after the court's clerk inadvertently sent notice to the wrong person).

But these cases take Clemons no further because they are limited to pro se litigants, and Clemons was represented by counsel. Clemons has pointed us to no case that extended equitable tolling to a represented party based on his attorney's receipt of misinformation from the state, and our research has turned up none. Indeed, it is not unusual for us to treat pro se litigants leniently while holding represented parties to a higher standard. See, e.g., Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) ("A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976))). Here, the misinformation purportedly provided by someone in the clerk's office was plainly contradicted by the Alabama Code, which, as we have noted, Clemons's attorney should have consulted. We can discern no sound basis to apply the extraordinary remedy of equitable tolling to excuse the negligent conduct of Clemons's attorneys.

B.  The State Court Properly Denied Clemons's Atkins Claim

24

Unlike his other thirty-one claims, Clemons's claim based on Atkins v. Virginia was timely. At the time of Clemons's trial and the initial filing of his Rule 32 petition, Supreme Court precedent had held that it was not per se unconstitutional to execute intellectually disabled persons. See Penry, 492 U.S. at 340. But on June 20, 2002, the Court decided Atkins v. Virginia, holding for the first time that the execution of an intellectually disabled person categorically violates the Eighth Amendment's guarantee against cruel and unusual punishment. 536 U.S. at 321. And as we've said, the substantive constitutional rule announced in Atkins applies retroactively to cases on collateral review. See, e.g., Holladay, 331 F.3d at 1173. Because Clemons properly raised his Atkins claim in the state courts in a timely manner after the decision and pursued it in this timely federal habeas petition thereafter, Clemons's Atkins claim is properly before us.

### 1. The State-Court Proceedings

Clemons first argued his Atkins claim before the Alabama Court of Criminal Appeals, which remanded the matter to the state trial court for an evidentiary hearing. After conducting an extensive hearing, the state court denied the claim. Clemons now says the state courts' denial of his claim was either contrary to or an unreasonable application of Atkins, or was based on an unreasonable determination of the facts in light of the evidence presented. We are unpersuaded.

Although the Court suggested in Atkins that an evaluation of intellectual disability should conform to current medical standards -- and embraced two clinical definitions, that of the American Association on Mental Retardation and the American Psychiatric Association, which both set forth the three-part test we use today -- it expressly left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317 (quotation omitted and alterations in original).  The Alabama Supreme Court took up this task in Ex parte Perkins, 851 So. 2d 453 (Ala. 2002). To show intellectual disability under Alabama law, the petitioner is required to prove three things: "(1) significantly subaverage intellectual functioning (i.e., an IQ of 70 or below); (2) significant or substantial deficits in adaptive behavior; and (3) the manifestation of these problems during the defendant's developmental period (i.e., before the defendant reached age 18)."  Smith v. State, 213 So. 3d 239, 248 (Ala. 2007) (emphasis in original) (citing Perkins, 851 So. 2d at 456).

The evidence adduced in the state court on Clemons's intellectual functioning included seven IQ tests Clemons received over the course of his life, beginning at age six.  The scores varied widely, from suggesting that he is highly disabled (51) to suggesting that he has a functioning ability falling within the range of ordinary (84).  In two of the seven, the test administrators explicitly found evidence of Clemons's "malingering," a term psychologists use to describe an

26

examinee's intentional frustration of a test, further complicating the state court's task of determining Clemons's level of intellectual functioning.

When Clemons was six years old, a school psychologist administered the Stanford-Binet intelligence test, and although school records following the test labeled Clemons "educable mentally retarded," his full-scale score on the test was a 77. In 1991, while in prison on unrelated charges at the age of 19, one year before the Althouse murder, Clemons took the BETA-II intelligence test and received a full-scale score of 84. This was the highest score Clemons would receive on any intelligence test. The state court's order referred to this test, but because it was not introduced at the evidentiary hearing, Clemons argues it should be disregarded.

Five additional intelligence tests were administered following Clemons's arrest for the Althouse murder. In 1992, Drs. Mark Hazelrigg and Bruce Berger administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") at the federal prison where Clemons was then held. Clemons obtained a full-scale IQ score of 51, which was by far the lowest score he would receive on any intelligence test. The doctors noted that people in the low-50s IQ range are "often in need of structured living and may be institutionalized" and are typically unable to care for themselves. They also observed that it would be virtually impossible to validly score an 84 on BETA-II and one year later validly score a 51 on WAIS-R,

27

in the absence of some intervening traumatic injury. Because Clemons could care for himself before his arrest and had scored an 84 on the BETA-II test administered the year before, Hazelrigg and Berger concluded that the score was invalid because Clemons was malingering.

In 2000, Dr. Kimberly Ackerson, who had been retained by defense counsel, again administered the WAIS-R. Clemons received a full-scale score of 73 this time, and Dr. Ackerson said this score placed Clemons in the "borderline" range for intellectual disability. In contrast to the previous administration of WAIS-R, Dr. Ackerson opined that Clemons did not appear to be malingering; rather, he "appeared motivated," was "cooperative," "deliberate in responding," and "interested in performance." Then, in 2001, the state's expert, Dr. King, administered the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"). Clemons obtained a full-scale score of 77.

In 2003, the defense expert, Dr. Golden, administered the Stanford-Binet Intelligence Scale-Fourth Edition. Clemons obtained a full-scale score of 58. Dr. Golden testified that because Stanford-Binet uses a slightly different scoring system, the full-scale score should be adjusted to be comparable with other tests such as the WAIS. Thus, he said the full-scale score of 58 should be adjusted to 61. Then he testified that even 61 was too low and the "better estimate of the Binet

28

IQ is to average [the] four scores" on the different portions of the exam, which in Clemons's case would yield a total score of 66.

Finally, in 2004, the state's expert, Dr. King, administered the original, unrevised WAIS, on which Clemons obtained a full-scale score of 67. King testified that WAIS is considered an easier test than WAIS-III, and he adjusted the score to 60 to bring it in line with the contemporary test scores. Dr. King also testified that he suspected Clemons was malingering on this test. He explained that Clemons appeared more indifferent than when he had evaluated him in 2001 (pre-Atkins), and that Clemons gave incorrect answers on several questions that he had previously gotten right. King opined that without an intervening medical event, such as a stroke, a 17-point drop in a three-year period would be difficult to explain. Thus, King concluded that Clemons must have been malingering on the 2004 test. To substantiate this hypothesis, King administered a Test of Memory Malingering ("TOMM"), which is a 50-item recognition test intended to assess malingering in psychological examinations. King testified that Clemons's score of 44 indicated that he was, in fact, malingering.

Moreover, the record contained additional evidence suggesting that Clemons was malingering when he was psychologically evaluated. Thus, for instance, Dr. Wilburn Rivenbark examined Clemons in 1992 and 1994 for his competency to stand trial. In the 1992 test, Rivenbark suspected that Clemons was malingering

29

for psychosis, because Clemons reported "seeing and hearing a 'little green friend,'" and several times smiled or laughed inappropriately but stopped acting this way when confronted.  Moreover, Clemons insisted that he had a history of mental illness despite the absence of any documentation supporting the claim. When Rivenbark evaluated Clemons again in 1994, Clemons refused to speak with him or make eye contact, leading Rivenbark again to opine that Clemons was malingering.  In both evaluations, Rivenbark concluded that Clemons was competent to stand trial.

In 1993, Clemons was evaluated for competency by Dr. William Grant at the request of defense counsel.  Dr. Grant similarly believed Clemons to be malingering.  Like Rivenbark, Grant noted that Clemons would laugh inappropriately but stop when confronted.  Grant also said that Clemons asked for Valium, and that Grant told him that the drug was unlikely to be available to inmates.  Grant did mention twice that a different anti-depressant, Sinequan, was sometimes available.  He was later informed that Clemons then asked prison staff for Sinequan by name on multiple occasions.  Grant added this: "I mention these events because they are discordant with the Defendant's inability to repeat" simple phrases on the test.  Thus, the record evidence on Clemons's intellectual functioning was contradictory but shadowed by a pattern of malingering on psychological examinations.

30

As for adaptive functioning, the second prong of Perkins, the only evidence of Clemons's deficits came from the testimony of Dr. Golden. Dr. Golden administered the Adaptive Behavior Assessment System test ("ABAS-II"). The ABAS-II assesses adaptive functioning in ten areas: communication, use of community resources, functional academics, health and safety, home living, leisure, self-care, self-direction, social skills, and work skills. Dr. Golden concluded that Clemons was severely deficient in self-direction, social skills, work skills, home living, health and safety, and leisure.

Ultimately, the state court concluded that Clemons had not carried his burden to show that he is intellectually disabled under Perkins or Atkins because he had shown neither that his intellectual functioning was significantly subaverage, nor that he had substantial deficits in adaptive functioning. The state trial court thoroughly recounted the testimony of Dr. King and Dr. Golden at the evidentiary hearing, as well as the intelligence tests submitted into the record. The court discounted those scores for which the test administrators noted evidence of malingering -- that is, the 1992 score of 51 on the WAIS-R and the 2004 score of 67 (adjusted to 60) on the WAIS. It further discounted the Stanford-Binet test administered by Dr. Golden, where Clemons received a full-scale score of 58, which Dr. Golden adjusted to a 66. The state court noted that Dr. Golden did not satisfactorily explain why the additional calculations were necessary to accurately

31

assess Clemons's score, nor why the Stanford-Binet test was a better measure of intellectual functioning for those with intellectual disabilities. Ultimately, the court discounted this score -- originally a full-scale score of 58, which was at least 15 points lower than Clemons's remaining test scores -- because of his extensive history of malingering. Having discounted the very low scores, the state court was left with four IQ scores: a 77 on the Stanford-Binet when Clemons was a child; an 84 when the BETA-II was administered in 1991; a 73 on the WAIS-R in 2000; and a 77 on the WAIS-III in 2001. The state court concluded, based on the tests, the evidence of malingering, and the fact that, of all of the doctors who evaluated Clemons over the years, only Dr. Golden ever opined that Clemons was intellectually disabled, that Clemons had failed to establish significant subaverage intellectual functioning. The court explained its finding this way: "when Clemons puts forward some effort he consistently scores in the 70-80 range on intelligence tests" and "when Clemons malingers he consistently scores in the 50-60 range."

The state trial court likewise found insufficient evidence of adaptive functioning deficits to support a finding of intellectual disability. The state court did not discuss Dr. Golden's testimony or the ABAS-II test. Instead, it relied on evidence of Clemons's adaptive strengths, including his employment history, his ability to form intimate relationships, his extensive involvement in criminal activity, his "post-crime craftiness," and his ability to use community resources.

32

Clemons, 55 So. 3d at 329.  In particular, the state court discussed Clemons's job as a pizza delivery worker and his relationships with women, including the fact that he had fathered two children.  The court also highlighted Clemons's efforts to evade law enforcement and his false statements following the Althouse murder.  The court found that this established a certain degree of criminal sophistication.  Finally, it noted Clemons's ability to use community resources, as evidenced by his ability to take a bus to Cleveland in order to elude capture.  Id. at 331.

The Alabama Court of Criminal Appeals affirmed, adopting the state trial court's findings and decision as its own.  See Clemons, 55 So. 3d at 322–32.  Finally, on August 13, 2010, the Alabama Supreme Court denied Clemons's petition for certiorari without an opinion.  Ex parte Clemons, No. 1070535 (Ala. Aug. 13, 2010) (per curiam).  Clemons claims that the Alabama Court of Criminal Appeals unreasonably applied Atkins and unreasonably determined the facts in light of the evidence.

### 2.  Intellectual Functioning

Clemons says that the state court unreasonably discounted certain valid IQ scores and unreasonably credited other invalid scores.  As we've elaborated, there are seven IQ scores in the record: 77 in childhood; 84 in 1991; 51 in 1992; 73 in 2000; 77 in 2001; 58 (adjusted to 66) in 2003; and 67 (adjusted to 60) in 2004.

The parties dispute several of these scores.  But regardless of those specific disputes, the state court's factual determinations were not unreasonable.

First, it is abundantly clear that a state court may discount IQ scores where there is evidence of malingering.  See Carroll v. Sec'y, DOC, 574 F.3d 1354, 1359, 1367–68 (11th Cir. 2009) (holding that it was not objectively unreasonable to discount low IQ scores in the face of evidence of malingering).  It was not unreasonable for the state court to discount an IQ score of 51 obtained in 1992 and a score of 67 (adjusted to 60) obtained in 2004.  Both tests were rendered infirm because, the state court found, Clemons was malingering.  Moreover, there was a substantial body of additional evidence suggesting that Clemons had engaged in a pattern of malingering, including the reports of several other doctors who had evaluated Clemons over the years.

Second, as the trier of fact considering the Rule 32 petition, the state court was entitled to make credibility determinations.  There was nothing objectively unreasonable about the state court having discounted the testimony of Dr. Golden and the 2003 Stanford-Binet test he administered.  In that one, Clemons received a full-scale score of 58, but Dr. Golden adjusted it to a 66.  Golden's testimony about the reliability of the Stanford-Binet test and the need to adjust Clemons's score was contradicted by the testimony of the state's expert, Dr. King.  The state court was entitled to believe Dr. King and discount Dr. Golden's opinion.

Discounting three scores on account of malingering left the state trial judge with four to consider: a 77 in childhood; an 84 in 1991; a 73 in 2000; and a 77 in 2001.  Based on all the evidence it heard, the court found that "when Clemons puts forward some effort he consistently scores in the 70-80 range on intelligence tests" but that "when Clemons malingers he consistently scores in the 50-60 range."  The valid scores placed Clemons in the 70–80 IQ range; therefore, the state court determined that Clemons failed to show significantly subaverage intellectual functioning.

At the time the state court denied Clemons's petition, no clearly established federal law prohibited state courts from using a bright-line cutoff for IQ scores above 70.  IQ scores at 70 and below indicate intellectual disability, while typically those above 70 do not.  The state court tellingly cited Alabama precedent which, at the time, explained that a full-scale score of 72 "seriously undermines any conclusion that [a petitioner] suffers from significantly subaverage intellectual functioning as contemplated under even the broadest definitions."  Ex parte Smith, 213 So. 3d 214, 225 (Ala. 2003).

Years after Alabama's denial of Clemons's Atkins claim, however, the Supreme Court decided Hall v. Florida, 572 U.S. 701 (2014).  There, the Court held for the first time that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error [+/- 5], the defendant must be able to

present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 723; see also Kilgore, 805 F.3d at 1308. "Hall explained that a state's assessment of a defendant's intellectual disability should focus on whether he has evidenced, beginning 'during the developmental period,' both (1) 'significantly subaverage intellectual functioning,' and (2) 'deficits in adaptive functioning (the ability to learn basic skills and adjust behavior to changing circumstances).'" Kilgore, 805 F.3d at 1308 (quoting Hall, 572 U.S. at 710). Because these criteria are "interrelated" and no "single factor [is] dispositive," "an individual with an IQ test score between 70 and 75 or lower may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." Hall, 572 U.S. at 722–23 (quotation omitted). However, we subsequently held that Hall's procedural constitutional rule was not retroactive. See Kilgore, 805 F.3d at 1314, cert. denied, 138 S. Ct. 446 (2017) (mem.); In re Henry, 757 F.3d 1151, 1161 (11th Cir. 2014).

Clemons relies heavily on Hall because the scores he argues are valid and should be considered -- 73 in 2000, 75 in 2001 (adjusted down to credit Clemons's claim that Dr. King made a scoring error that produced the score of 77), 66 in 2003, and 67 in 2004 -- average to 70.25. After Hall, this would place Clemons in the standard error range of 70 to 75, and the intelligence prong would not be dispositive on its own, but rather must be considered in conjunction with adaptive

functioning.  But we have already held that before <u>Hall</u> was decided "[n]othing in <u>Atkins</u> suggested that a bright-line IQ cutoff of 70 ran afoul of the prohibition on executing the intellectually disabled."  <u>Kilgore</u>, 805 F.3d at 1312.  And thus, before <u>Hall</u>, a state court could conclude that a petitioner failed to satisfy the intellectual functioning prong of <u>Atkins</u> when his scores were above 70 but below 75.

In short, it was neither contrary to nor an unreasonable application of <u>Atkins</u> for the state court to conclude, as it did, that "when Clemons puts forward some effort he consistently scores in the 70-80 range on intelligence tests," and thus that he had failed to demonstrate significantly subaverage intellectual functioning.

The state court's conclusion was bolstered by the fact that of the seven experts who evaluated Clemons in his adult years -- five of whom administered tests of intellectual functioning -- only one, Dr. Golden, ever opined that Clemons was intellectually disabled.  Indeed, five out of the seven who examined him (Hazelrigg, Berger, King, Rivenbark, and Grant) opined that Clemons was malingering psychological symptoms.  In the face of this body of evidence, we cannot say that the state court's determination that Clemons had failed to show significantly subaverage intellectual functioning was based on an unreasonable determination of the facts, or that it was an unreasonable application of clearly established Supreme Court law.

### 3.  Adaptive Functioning

37

Finally, Clemons argues that the state court unreasonably applied <u>Atkins</u> because it focused on his adaptive strengths, rather than on his weaknesses, and because it failed to account for Dr. Golden's testimony regarding adaptive deficits and the ABAS-II test.  Clemons relies on <u>Moore v. Texas</u>, 137 S. Ct. 1039 (2017), a Supreme Court case that long post-dates the state court's denial of his Rule 32 petition and thus could not have been "clearly established" at the time the state courts decided this matter.[3]  In <u>Moore</u>, the Supreme Court held that the Texas Court of Criminal Appeals had erred in "overemphasiz[ing] [petitioner's] perceived adaptive strengths," despite the medical community's focus on "adaptive <u>deficits</u>."  <u>Id.</u> at 1050 (emphasis in original).  Moreover, the Supreme Court heard <u>Moore</u> on direct review, rather than on collateral review, where AEDPA requires substantial deference.  And in a more recent decision -- <u>Shoop v. Hill</u>, 139 S. Ct. 504 (2019) (per curiam) -- the Supreme Court, this time on collateral review, rejected the argument that a pre-<u>Moore</u> state court decision unreasonably applied <u>Atkins</u> by focusing on adaptive strengths over adaptive deficits.  The Court reasoned that because "<u>Atkins</u> did not definitively resolve how [the adaptive functioning prong] was to be evaluated but instead left its application in the first instance to the States," it was not an unreasonable application of <u>Atkins</u> to focus on

---

[3] This Court also has held that *Moore* cannot be applied retroactively under *Teague v. Lane*, 489 U.S. 288 (1989).  *See Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1338–40 (11th Cir. 2019), *cert. denied sub nom.*, *Smith v. Dunn*, 2020 WL 3578738 (July 2, 2020).

adaptive strengths.  <u>Id.</u> at 508.  While that approach today would be contrary to clearly established federal law -- that is, contrary to <u>Moore v. Texas</u> -- it was neither contrary to nor an unreasonable application of clearly established Supreme Court law when the state court denied Clemons's petition.

* * *

At the end of the day, we hold that the district court properly denied Clemons's habeas petition and AFFIRM its judgment.